[Crim. No. 25231. Second Dist., Div. Three. Apr. 8, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANTHONY VAN ALSTYNE, Defendant and Appellant.

## COUNSEL

David C. Tunick, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Kent L. Richland and Gerald T. Shea, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COBEY, Acting P. J.**—John Anthony Van Alstyne appeals from a judgment of conviction of sale of marijuana, a violation of Health and Safety Code section 11360,[1] following a nonjury trial. The appeal lies. (Pen. Code, § 1237, subd. 1.)

Appellant contends that: (1) there is insubstantial evidence to sustain his conviction; (2) the conviction should be reversed because police entrapment led to the commission of the crime; and (3) certain incriminating testimony was admitted in violation of his *Miranda* rights.[2]

In a supplemental brief appellant calls our attention to the fact that under the California Uniform Controlled Substances Act (Health & Saf. Code, § 11000, et seq.) the term "marijuana" refers expressly only to the plant "Cannabis sativa L." (Health & Saf. Code, § 11018.)[3] Appellant contends that his conviction must therefore be reversed on the further ground that there is no evidence that the marijuana involved in his case was Cannabis sativa L. as opposed to one of the other species of marijuana, viz., Cannabis indica, Cannabis ruderalis, Cannabis gigantea, and a species not yet named but located in Afghanistan. (See *United States* v. *Walton* (D.C. Cir. 1975) 514 F.2d 201, 202.)

### FACTS

On March 8, 1973, Officer Robert Moran and a confidential informant met with appellant's codefendant, Richard Clements, in Newport Beach for the purpose of purchasing marijuana, as part of an undercover investigation of drug traffic in the area. Over the next few days, Moran and Clements met several more times in an effort to close a deal. Eventually, though, Clements informed Moran that he was unable to

---

[1]Section 11360 provides in pertinent part: "(a) Every person who . . . sells . . . any marijuana shall be punished by imprisonment in the state prison for a period of .five years to life . . . ."

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 707, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3]Section 11018 defines marijuana as follows: " 'Marijuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination."
See also Health and Safety Code section 11001.

procure marijuana through Newport Beach sources and that he would have to go directly to his Long Beach source to arrange a sale.

On March 16th, Moran met with Clements at Bixby Park in Long Beach and was told by Clements that he had arranged a purchase of 100 pounds of marijuana for $8,500 and that he would take Moran to meet "John," his Long Beach connection, if the proposed deal was satisfactory. Clements further explained that Moran would first show "John" the money and see some samples; then Moran would wait while "John" picked up the marijuana and returned with it.

Moran agreed to these terms and Clements thereupon directed him to drive to a nearby alley where "John's" apartment was located. There, Moran waited in the car while Clements went inside to get "John." A few minutes later, Clements emerged, accompanied by appellant, who asked Moran to show him the money. Moran did so.[4] Appellant thereupon stated that he would go tell "them" to pick "it" up, that it would take about 20 minutes to complete the delivery, and that in the meantime Moran and Clements were to wait in the park.

Sometime later, Clements left Moran for about 15 minutes. Upon his return, he further informed Moran that the marijuana would be delivered in a green and white Maverick; that when the marijuana had arrived appellant would give Moran a garage key; and that Moran would then go to the designated garage, inspect the marijuana, lock the garage, return to the park to pay Clements and, finally, return to the garage to pick up the marijuana.

Shortly thereafter, a green and white Maverick arrived driven by another codefendant, Gary Frankel. Frankel put a sleeping bag and two trash bags into the designated garage, locked the door, and drove away. About 15 minutes later, appellant and a third codefendant, Lee Johnson, approached Moran and Clements. Appellant introduced Johnson to Moran and told Moran that he now could inspect the marijuana and purchase it if it proved satisfactory.

Appellant, Johnson, Clements, and Moran thereupon walked over to the garage. Appellant opened the garage door with a key, pointed to a sleeping bag and two trash bags inside, and said "there they are" (or "there it is"). Moran was able to observe a green wrapped block and a

---

[4]Officer Moran only had $5,700, but appellant did not count the money and did not detect the shortage when Moran showed him the roll of bills he was carrying.

tinfoil wrapped block inside the trash bags. Moran, on the basis of his experience and expertise in the detection of marijuana, concluded that these blocks were "kilos" of marijuana. He thereupon signaled several plainclothes officers who were waiting nearby to move in for the arrest.

At his trial, appellant stipulated that an expert forensic chemist subsequently examined the contents of the sleeping bag and the two trash bags and determined them to be marijuana. The discussion that preceded appellant's so stipulating is set forth later in the opinion. (See fn. 8, *post.*)

## DISCUSSION

### *The Substantiality of the Evidence*

■ Appellant contends that there is insubstantial evidence to sustain his conviction.

■ We disagree. The offense of which appellant was convicted consists of two elements: (a) a sale of marijuana and (b) knowledge of the character of the substance sold. (See *People* v. *Innes,* 16 Cal.App.3d 175, 178 [93 Cal.Rptr. 829].) Such knowledge may be proved by circumstantial evidence. (*People* v. *Sloss,* 34 Cal.App.3d 74, 86 [109 Cal.Rptr. 583].)

In this connection we must bear in mind that we are required to view the record in the light most favorable to the People, as the party which prevailed below, and to draw all reasonable inferences from the evidence presented to the trial court in support of its judgment. (*People* v. *Vann,* 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].)

■ The record, so viewed, obviously contains substantial evidence to sustain appellant's conviction. From appellant's knowledge of the large amount of money involved in the transaction and from the clandestine arrangements he made, the trial court clearly was entitled to infer that appellant was not an innocent dupe being used by Clements and that appellant knew full well that more than a sleeping bag and two trash bags were being sold to Moran.

### *Entrapment*

■ Appellant next contends that his conviction should be reversed because police entrapment led to the commission of the crime. Specifi-

cally, he contends that the testimony of a defense witness, Robert LaCaria, indicates that Officer Moran arguably entrapped codefendant Clements into arranging the sale of marijuana. Appellant further contends that he should be entitled to assert the defense, as well as Clements, by analogy to the "fruits of the poisonous tree" doctrine in search and seizure cases. (See *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

There are several answers to this contention.[5] First, LaCaria's account of the conversations between Moran and Clements conflicts with Moran's own account of those conversations, and the trial court was entitled to accept Moran's account as the true one.

Second, while California recognizes two independent rationales for the defense of entrapment—(a) to avoid punishment of individuals who had no predisposition to commit a crime but who were induced by law enforcement agents to do so; and (b) to control illegal police conduct out of regard for the courts' own dignity (see *People* v. *Moran,* 1 Cal.3d 755, 760-761 [83 Cal.Rptr. 411, 463 P.2d 763]; *Patty* v. *Board of Medical Examiners,* 9 Cal.3d 356, 368 [107 Cal.Rptr. 473, 508 P.2d 1121]), neither rationale is applicable here. Appellant obviously harbored a pre-existing intent to sell marijuana, and we see no affront to the courts' dignity in the type of undercover "buy" program at issue here. Officer Moran's negotiations with appellant involved no more persuasion on Moran's part than would be necessary for an ordinary purchase and sale, and under such circumstances there is no entrapment. (See *Patty, supra,* 9 Cal.3d at p. 368; *People* v. *Moraga,* 244 Cal.App.2d 565, 568 [53 Cal.Rptr. 563]; 1 Witkin, Cal. Crimes (1963) § 181, pp. 173-174; Note, *The Defense of Entrapment in California* (1968) 19 Hastings L.J. 825, 842-843.)

Finally, appellant cites us no case that permits the entrapment defense to be asserted vicariously, which is what he seeks to do under his "fruits of the poisonous tree" analogy. To our mind, reprehensible police tactics are adequately deterred under a rule that limits the availability of this defense in the usual case to the *victims* of such tactics. The marginal deterrence that would be added by making the defense available to

[5]One answer on which we decline to rely is the Attorney General's point that the entrapment defense cannot be raised for the first time on appeal. While the Attorney General is entirely correct in his contention (see *People* v. *Pijal,* 33 Cal.App.3d 682, 692 [109 Cal.Rptr. 230]), we elect to dispose of the entrapment question on its merits because of the ever-present *Ibarra* doctrine. (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

others as well ordinarily is far out-weighed by society's interest in seeing those who are guilty of crime punished for their offenses.[6]

## Compliance with Miranda

■ Appellant next contends that certain incriminating testimony was admitted in violation of his *Miranda* rights.[7] This contention arises out of the following circumstances. Shortly after appellant was taken into custody he invoked his constitutional right to remain silent. Some 20 minutes thereafter a police officer asked appellant his address for the purpose of including this information in a standard booking report. Appellant gave the officer an address which corresponded to the apartment building where the garage containing the marijuana was located, and at appellant's trial the officer was permitted to so testify over appellant's timely objection that this evidence was obtained by the police in the manner just stated. Appellant contends that this ruling by the trial court constitutes reversible error.

We disagree in view of the well established rule that such routine information can be elicited from a suspect in custody even after he has exercised one or more of his *Miranda* rights. (See *People v. Johnson,* 20 Cal.App.3d 168, 175 [97 Cal.Rptr. 332]; *People v. Hernandez,* 263 Cal.App.2d 242, 253 [69 Cal.Rptr. 448]; *People v. Walters,* 252 Cal.App.2d 336, 338 [60 Cal.Rptr. 374].) Furthermore, the error, if any, is harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Harrington v. California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726]) in view of the overwhelming evidence of appellant's guilt.

## The Marijuana Stipulation

■ We next consider whether appellant is prevented from raising his final contention by reason of the aforementioned stipulation that the substance contained in the sleeping bag and the trash bags was marijuana. We conclude that he is not. The discussion that preceded the stipulation indicates to our satisfaction that appellant, through his trial counsel, intended only to stipulate that the substance was "marijuana" in the generic sense, and not that it was the particular species Cannabis sativa L. In other words, while the remarks of appellant's trial counsel

---

[6]See A.L.I., Model Penal Code, section 2.13(2) (Proposed Official Draft, 1962), which provides in pertinent part: "a person prosecuted for an offense shall be acquitted if he proves ... that *his* conduct occurred *in response* to an entrapment." (Italics added.)

[7]See footnote 2, *supra.*

are ambiguous, it appears to us that the thrust of those remarks was that he would agree to the stipulation on his client's behalf only on condition that his client's right to raise this contention on appeal was preserved.[8] Under these circumstances, we must decide appellant's final contention on its merits.

## The Definition of "Marijuana"

Appellant's contention is initially premised on recent claims that marijuana is a so-called "polytypical" plant with more than one species presently extant. As noted earlier in the opinion, some botanical taxonomists recognize as many as four species of marijuana other than

[8]The discussion that preceded the stipulation went as follows: Deputy District Attorney Veganes offered on behalf of the People a stipulation to the effect that an expert forensic chemist be deemed to have testified that he had determined that the substance contained in the sleeping bag and the trash bags was "cannabis sativa, more commonly known as marijuana." The trial court thereupon asked defense counsel, including appellant's attorney, Unrot, whether on behalf of their respective clients they agreed to the stipulation. The following exchange then ensued:

"MR. UNROT: May I bring up a point here? This is a sort of an aside. I don't even know if the district attorney is aware of it. There was a recent report I read that arose out of a case. It wasn't an official report. It was a newspaper account of a case arising out of the court in Florida in which the—in which the—well, the prosecution offered a stipulation, cannabis sativa, and the defense argued that it wasn't cannabis sativa; that there were three different types of species of marijuana, only one of which was cannabis sativa.

It raises something of a little bit of a problem only because I don't know if the report, itself, is legitimate or if the scientific analysis is appropriate. Even the chemist in that case, incidentally, did not know of this—of this problem.

If we have to stipulate that it is cannabis sativa, I would do so conditionally on behalf of my client only because I have knowledge of this particular issue or problem.

"THE COURT: Will you stipulate—

"MR. UNROT: As to it being marijuana.

"THE COURT: Will you stipulate that they found marijuana?

"MR. UNROT: Yes.

"THE COURT: Any question about that? Any objection?

"MR. VEGANES: Fine."

Obviously Unrot's statement that he would "conditionally" stipulate that the substance was Cannabis sativa is ambiguous. It appears to us, though, that he did not thereby intend to concede the point appellant now raises. Furthermore, *Ibarra* error (*People* v. *Ibarra, supra,* 60 Cal.2d at p. 464) might well have occurred had Unrot made any such concession.

Incidentally, we find no merit in the Attorney General's contention that the People relied on this "conditional" stipulation when they refrained from calling the forensic chemist as a witness. As the Attorney General points out elsewhere in his supplemental brief, there is at the present time no reliable biochemical or spectrographic method for distinguishing between the various species of marijuana. The species apparently can be distinguished only as growing plants and that obviously was not the condition of the marijuana here at issue. Consequently, the forensic chemist's testimony necessarily would have been inconclusive as to which species of marijuana it was that appellant sold to Officer Moran.

sativa L. On the other hand, studies of equally recent vintage conclude that marijuana is purely "monotypic" in species and yet has several varieties. Thus, whether marijuana is polytypic or monotypic is in doubt as of the present date.[9] Nevertheless, we will accept appellant's initial premise and assume for purposes of decision that more than one species of marijuana are extant.

We thus must consider whether the Legislature meant to prohibit the sale of all species of marijuana or only the sale of species Cannabis sativa L. We first note that all species of marijuana apparently possess the toxic agent "tetrahydrocannabinol," popularly known as THC, and that it unquestionably is the "hallucinogenic" or euphoric effects produced by this agent which led to the ban on importation, possession, and distribution of marijuana. Thus, appellant's argument, in effect, is that the Legislature meant to outlaw the euphoric effects of the sativa L. species but not the euphoric effects of other species. This result seems manifestly unreasonable and furthermore could raise serious constitutional equal protection problems if it were adopted. As the Circuit Court

[9]See Emboden, *A Botanical History of the Genus Cannabis With Reference to Legislation,* California Attorneys for Criminal Justice Forum, August/September 1974 Supplement, pages 1-5; Fullerton & Kurzman, *The Identification and Misidentification of Marijuana* (Fall 1974) 3 Contemp. Drug Prob. Q. 291-344; Quimby, Doorenbos, Turner & Masoud, *Mississippi-Grown Marijuana—Cannabis Sativa, Cultivation and Observed Morphological Variations* (1973) 27 Economic Botany 117-127; Schultes, *Random Thoughts and Queries on the Botany of Cannabis,* in The Botany and Chemistry of Cannabis (Joyce & Curry edits. 1970) pages 11-38; Schultes, Klein, Plowman & Lockwood, *Cannabis: An Example of Taxonomic Neglect* (1974) 23 Botanical Museum Leaflets, Harvard University 337-367; Small & Beckstead, *Common Cannabinoid Phenotypes in 350 Stocks of Cannabis* (1974) 36 Lloydia 144-165.

One court which recently had occasion to review the relevant literature summarized it in these terms:

"The existence of two species of Cannabis, namely Cannabis sativa L. and Cannabis indica Lam., has been known and published since about 1783, and the probable existence of the third species, Cannabis ruderalis Jan., has been published since about 1924. Despite these publications from which it has been clear that the genus Cannabis is polytypic (that is, that the genus includes more than one species), until about 1973, and specifically in 1938 and 1970, the genus Cannabis had been generally considered monotypic. Many people, including chemists, pharmacologists, physicians, and agronomists had shared the view that the genus Cannabis is monotypic, and there had been some acquiescence by taxonomists in expressions of this view. The question whether the genus is monotypic or polytypic had not been addressed and investigated in a deliberate and conscious manner within the community of taxonomists until about 1973. Presently, within the community of taxonomists, the weight of opinion is that the genus Cannabis is polytypic.

"Among the physicians and pharmacologists who have expressed over the years the view that the genus Cannabis is monotypical, there have been frequent references to Cannabis as Cannabis indica." (*United States* v. *Lewallen* (W.D.Wis. 1974) 385 F.Supp. 1140, 1141-1142.)

of Appeals for the District of Columbia recently observed: "[A]n individual convicted for distribution of sativa L. could state with more than a little justification that no legitimate legislative purpose permits the government to jail persons who obtain a THC 'high' from sativa L. but to not prosecute persons who obtain the exact same 'high' from another species." (*United States* v. *Walton, supra,* at pp. 202-203.) Moreover, there apparently is no reliable biochemical or spectrographic method by which to distinguish between the various species of marijuana. Unless the prosecution has access to the growing plant (a relatively infrequent situation) it cannot prove that a particular defendant possesses one kind of marijuana or another. Scientific advances may eventually lead to the development of such methods, but since the Legislature did not have the benefit of any such method when it enacted the current version of our marijuana statute, one must certainly pause to consider why the Legislature would enact a law the violation of which could not be proved on the basis of present knowledge. Furthermore, only citizens with expert botanical knowledge are able to distinguish between the various species of marijuana. This suggests a serious due process question. As the Circuit Court for the District of Columbia again observed: "[C]ould the government prosecute an individual for possession of sativa L. when there are no means whereby the average citizen can distinguish between sativa L. and other species to thus conform his conduct to the requirements of law? It presses us to extremes to hold that Congress would enact a law the violations of which are not detectable to the group of citizens to whom the law is addressed." (*Id.* at p. 203.) Finally, as the Attorney General notes, should it become necessary for the prosecution to prove beyond a reasonable doubt that the marijuana a particular defendant possesses is sativa L., then the next logical step would be to require law enforcement officers to establish probable cause to believe that a substance is sativa L. before seizing it. In other words, police officers themselves would have to become expert botanists. Otherwise the only evidence that a crime had been committed necessarily would be inadmissible even if it subsequently could be proved that it was, in fact, sativa L.

With the anomalous consequences of appellant's position in mind, we turn to the problem before us.

### Can We Consider the Legislative History of Section 11018?

A threshold, and potentially decisive, question is whether we are entitled to look to the legislative history of section 11018 in determining

whether the Legislature meant to prohibit the sale of all species of marijuana or only sativa L. As a general rule, when a statute is free from ambiguity or uncertainty it needs no construction and will be enforced as written. (E.g., *Skivers* v. *State of California,* 13 Cal.App.3d 652, 655 [91 Cal.Rptr. 707].) Thus, appellant's strongest argument is that the term "Cannabis sativa L." used in section 11018 to define "marijuana" is too definite and specific, too free from ambiguity, to admit of any construction other than a literal one. As one court recently put it: "It seems clear that if in a penal statute Congress used a word like 'giraffe' from the animal kingdom, the statute could not be construed to include a 'potato' from the plant kingdom. This would be true even though the Congressional hearing and floor debate made plain that the members thought that the term giraffe includes potatoes. . . . That penal statutes are to be strictly construed requires no citation of authority." (*United States* v. *Lewallen, supra,* 385 F.Supp. at pp. 1142-1143.)[10] In other words, appellant's essential argument is that: (a) the Legislature in defining "marijuana" deliberately adopted a particular taxonomic description; and (b) for better or worse, the People are now bound by that description.

There are two answers to this argument. First, we do not believe that section 11018 is entirely free from ambiguity because if we assume for the sake of analysis that the term "marijuana" refers only to the sativa L. species and that other species are not "marijuana" within the meaning of section 11018, the following anomaly would result. Section 11350 of the Health and Safety Code proscribed, at the time of appellant's offense, the unlawful possession of "any controlled substance classified in Schedule I or II *other than marijuana.*" (Stats. 1972, ch. 1407, § 3, p. 3011; italics added.)[11] Schedule I, which is set forth in section 11054, lists a number of controlled substances, including "(d) [a]ny material . . . which contains any quantity of the following hallucinogenic substances[:] . . . (17) Tetrahydrocannabinols [THC]." Read literally, section 11054 would

---

[10]Incidentally, the common law rule that penal statutes are to be strictly construed has been legislatively abolished in California. Instead our Penal Code expressly declares that its provisions are to be construed "according to the fair import of their terms, with a view to effect its objects and to promote justice." (Pen. Code, § 4.) While there is no comparable provision in the Health and Safety Code, it has long been held that the rule of construction enunciated in section 4 applies to criminal statutes that are not part of the Penal Code as well as to those that are. (See, e.g., *In re Mitchell,* 1 Cal.App. 396, 398 [82 P. 347].)

[11]Section 11350 has since been amended. (Stats. 1973, ch. 1078, § 2, p. 2171, urgency, eff. Oct. 1, 1973.) The 1973 amendment eliminated the words "other than marijuana" from section 11350, but did not eliminate the anomaly in punishment subsequently discussed in the text.

thus seem to include the newly recognized species of Cannabis as Schedule I substances under subdivision (d)(17), since all such species certainly would constitute "materials" that contain THC. From this it would follow that the newly recognized species are proscribed under section 11350 of the code. Section 11350 excludes only "marijuana" as defined in section 11018 from its proscription and, therefore, only the species sativa L. would fall within the exclusion.

Thus, if we read the statute literally and assume that newly recognized species, such as Cannabis indica, are not "marijuana" within the meaning of section 11018, the possession of these other species, far from being left in a statutory limbo, would still be proscribed—albeit under section 11350 instead of section 11357. This is what creates the anomaly. The penalty for possession under section 11350 for a first offense is 2 to 10 years; whereas under section 11357 it is only 1 to 10 years. In other words, the minimum term for possession of one of the newly recognized species would be *greater* than the minimum term for possession of sativa L. This would raise much the same constitutional equal protection problem we considered earlier in the opinion when we discussed the possibility that the Legislature intended to prohibit only the sativa L. species. Obviously the Legislature did not in our penal statutes intend such an irrational and unequal treatment of the various species of marijuana. Accordingly, our conclusion is *not* that the Legislature intended that other species of marijuana be treated separately under Schedule I. ■ Instead, we conclude that the Health and Safety Code *on its face* indicates that it was written under the assumption that marijuana is monotypical, rather than polytypical, in species. Under these circumstances, we believe that section 11018 simply does not admit of a literal interpretation, that judicial construction is required, and that we are entitled to look to the legislative history of section 11018 to determine the probable legislative intent.

This same result can be reached by another route. While the term "Cannabis sativa L." appears quite definite and specific and, as of today, at least arguably refers to only one of several species of marijuana, it is also true that as late as 1972 when the Uniform Controlled Substances Act was enacted in California this same term appears to have had an equally definite and specific meaning, albeit a different one, and to have been used interchangeably in popular usage with the general term "marijuana." In 1969, for example, the United States Supreme Court flatly stated: "it seems that there is only one species of marihuana . . . ." (*Leary* v. *United States* (1969) 395 U.S. 6, 50 [23 L.Ed.2d 57, 90, 89 S.Ct.

1532]; cf. *People* v. *Savage*, 64 Cal.App.2d 314, 315-316 [148 P.2d 654].) To the same effect were numerous general reference materials available to legislators and laymen alike prior to 1972. (E.g., Black's Law Dict. (4th ed. 1951) pp. 1119-1120; Webster's Third New Internat. Dict. (1966) pp. 327, 1056, 1381.) Indeed, in 1972, the same year that the act was passed here in California, the National Commission on Marihuana and Drug Abuse in its First Report stated: "[B]otanists believe . . . *Cannabis sativa* represents a single species which has not stabilized and has many variations." (Appendix I-2, Marihuana: A Signal of Misunderstanding, p. 16; citation omitted.)

If we are to read section 11018 as a clear and unambiguous expression of legislative intent, it would appear to us that the term "Cannabis sativa L." ought to be given the popular meaning that it had in 1972. We must assume that when the Legislature adopted this particular term it had in mind its generally accepted meaning as of that date—*not* whatever generally accepted meaning it may since have acquired. For this reason, and in view of the above-cited sources, there is substantial justification for the position some courts have taken that the term "Cannabis sativa L." as used in marijuana statutes passed in the early 1970's clearly and unambiguously refers to *all* species of marijuana. (See, e.g., *United States* v. *Walton, supra,* at p. 7.) For present purposes, however, it is sufficient that the term at least admits of this construction, since we then are entitled to turn to the legislative history of section 11018 for guidance.

### *History of the Marijuana Statutory Definition*

California first enacted a drug control statute regulating the possession of marijuana in 1929. In contrast to the taxonomic definition currently employed in section 11018, the 1929 act enumerated the various popular names of the plant: "hemp or loco weed (cannabis sativa), Indian hemp . . ." (Stats 1929, ch. 216, § 1, p. 380.) Despite other changes in the California statute in 1931, 1933, 1935, and 1937, the just-quoted enumeration remained unchanged until 1939.

Meanwhile, in 1932 the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Narcotic Drug Act, which was subsequently adopted by at least 39 jurisdictions (not including California). (See Annot., 119 A.L.R. 1399.) While the act did not specifically include marijuana among its controlled substances, a footnote to the act suggested certain statutory language to be used in the event a state decided to regulate the possession of marijuana. This

suggested language apparently represents the first narrow definition of the plant, and it approximates the language of our present section 11018. The footnote, in pertinent part, reads as follows: " 'Cannabis' includes the following substances under whatever names they may be designated: (a) The dried flowering or fruiting tops of the pistallate plant Cannabis sativa L., from which the resin has not been extracted, (b) the resin extracted from such tops, and (c) every compound, manufacture, salt, derivative, mixture or preparation of such resin, or of such tops from which the resin has not been extracted." (Uniform Narcotic Drug Act of 1932, Note to § 1, National Conference of Commissioners on Uniform State Laws, 42d Annual Conference Proceedings (1932) p. 326.)

The language of the 1932 uniform act was adopted in a 1937 amendment to the federal Harrison Act (Act of Dec. 17, 1914, ch. 1, 38 Stat. 785), which until that time had regulated only opium and cocoa leaves. The 1937 amendment (Marihuana Tax Act of 1937) included marijuana among those drugs taxed and regulated by the federal government, and adopted the following definition of marijuana, which has survived virtually unchanged to the present date: "The term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture or preparation of such plant, its seeds or resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination." (Act of Aug. 2, 1937, ch. 553, § 1(b), 50 Stat. 551.) The 1939 and 1954 amendments to the Internal Revenue Code did nothing to change this definition. (Int. Rev. Code of 1939, § 3238(b); Int. Rev. Code of 1954, § 4761(2).) Those federal Courts of Appeals that have had occasion to review the legislative history of the various federal enactments have uniformly concluded that nothing in that history indicates that Congress recognized the existence of more than one species of marijuana either in 1937, 1939, or in 1954. (See *United States* v. *Walton, supra,* at pp. 203; *United States* v. *Honneus* (1st Cir. 1974) 508 F.2d 566, 574-575; but see *United States* v. *Lewallen, supra,* 385 F.Supp. at p. 1142.)

California revised its definition of the proscribed plant in 1939, but the effect was only to make it conform partially with the uniform and federal definitions. While in 1929 "cannabis sativa" was apparently considered

the formal name only for hemp and loco weed, and not the formal name for Indian hemp, in 1939 "Cannabis sativa" itself became the proscribed substance, and was defined for statutory purposes as "cannabis sativa, hemp, Indian hemp, loco weed, or marihuana." (Stats. 1939, ch. 60, §§ 11001, 11003, pp. 755-756.) An amendment in 1940 deleted loco weed from this definition. (Stats. 1941, First Ex. Sess. of 1940, ch. 9, § 3, p. 18.) Finally, in 1959 a further amendment added section 11003.1 to the code, which defined "marijuana" as the plant "Cannabis sativa L. (commonly known as marijuana)." (Stats. 1959, ch. 1112, § 2, p. 3193.) In other words, while by 1959 the definitions of marijuana were nearly identical in the Internal Revenue Code, the Uniform Act of 1932, and the California Health and Safety Code, our definition, and only our definition, expressly pointed out that "Cannabis sativa L." was a term of general application apparently synonomous with all plants "commonly known as marijuana."

In 1970, then, the federal Bureau of Narcotics and Dangerous Drugs (BNDD) drafted model state laws and submitted them to the National Conference of Commissioners on Uniform State Laws, which revised and adopted the proposed draft as the Uniform Controlled Substances Act of 1970. This was done almost simultaneously with the enactment of the Federal Drug Abuse Prevention and Control Act. (Act of Oct. 27, 1970, 84 Stat. 1242, as codified, 21 U.S.C. § 801, et seq. (1970).) The definitions of marijuana in both acts are virtually identical. (Compare 21 U.S.C. § 802(15) (1970) with Uniform Controlled Substances Act, § 101(n).) By December of 1971 BNDD officials had met with 45 of the 50 state governors to encourage passage of the new Uniform Act. (Hearings on Drug Abuse Control Activities of the Federal Government Before the Subcommittee on Public Health and Environment of the House Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess., pp. 315-316 (1972).) California adopted the act in 1972 largely for the purpose of conforming California law to federal law. (See Comment (1973) 4 Pacific L.J. 382, 383.) There is no reported legislative history surrounding the 1972 enactment, and no information of public record which we have been able to uncover that throws light upon whether the Legislature was or was not aware of the possible existence of more than one species of marijuana when it adopted the act.

■ This concludes our survey of the legislative history of section 11018. We are satisfied on the basis of this survey that from 1929 to the present day the Legislature has always meant to outlaw all plants popularly known as marijuana, and that the Legislature certainly did not

mean to change that policy in 1972 when it adopted almost verbatim the uniform and federal definitions of marijuana. True, the Legislature thereby opted for a purely taxonomic description of marijuana. But the change from "Cannabis sativa L. (commonly known as marijuana)" to "Cannabis sativa L." surely was not intended to signify the basic change in policy that appellant's argument assumes it signified. Instead, the change in wording undoubtedly appeared trivial at the time and one which could be indulged for the sake of uniformity. Had the possibility that marijuana is polytypical in species been called to the attention of the Legislature, we are satisfied that the Legislature either would have kept the old definition or would have adopted a new one that expressly included all newly recognized species.

Accordingly, we hold that the term "Cannabis sativa L." in section 11018 must be construed as a general term which includes all plants popularly known as marijuana that contain the toxic agent THC. We further note that every federal appeals court that has addressed the contention now before us has reached the same conclusion. (See *United States* v. *Walton, supra; United States* v. *Honneus, supra; United States* v. *Kinsey* (2d Cir. 1974) 505 F.2d 1354; *United States* v. *Gaines* (5th Cir. 1974) 489 F.2d 690; *United States* v. *Rothberg* (2d Cir. 1973) 480 F.2d 534, cert. den., 414 U.S. 856 [38 L.Ed.2d 106, 94 S.Ct. 159], affg. (E.D.N.Y. 1972) 351 F.Supp. 1115; *United States* v. *Moore* (3d Cir. 1971) 446 F.2d 448, affg. (E.D. Pa. 1970) 330 F.Supp. 684.) While the Legislature with the wisdom of hindsight could have been clearer in its definition of marijuana, we do not doubt that the Legislature intended to proscribe possession of and dealings in all species of marijuana and that section 11018 must be read to effectuate this underlying legislative purpose. (See *Select Base Materials* v. *Board of Equal.*, 51 Cal.2d 640, 645 [335 P.2d 67].)

*Was Appellant Afforded Constitutional Due Process of Law?*

■ A remaining question is whether section 11018's definition of marijuana was adequate to forewarn appellant, as one to whom the statute was addressed, of the crimes for which he was later charged. We think it was. Right or wrong, the monotypic classification of marijuana has had considerable currency, until very recently at least (see fn. 9, *ante*), and the term "Cannabis sativa L." in section 11018 was, we think, sufficient in early 1973 to put a seller of marijuana on notice that he acted at his peril. The proscription of marijuana, after all, is directed to the public at large and not to botanists alone. Appellant has made no

attempt to demonstrate that members of the general public "of common intelligence" would have had to guess as to the meaning of our marijuana statute in early 1973 and would have differed as to its application. (See *Connally* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; *United States* v. *Walton, supra,* p. 204, fn. 16.)

Had the question before us arisen in connection with a drug less widely publicized than marijuana, the definition set forth in section 11018 might well have created a substantial due process problem. Here, though, we think it too obvious for further discussion that appellant, as a man presumed to be of common intelligence, understood in advance that his clandestine sale of marijuana, whatever the species, constituted a crime. (See *United States* v. *Honneus, supra,* 508 F.2d at pp. 575-576.)

Nevertheless, we take this occasion to state that in future cases we undoubtedly will have to consider whether the term "Cannabis sativa L." has so changed in general usage and understanding since the time of the 1972 enactment of section 11018 that the section no longer provides fair notice to potential violators of the nature of the acts prohibited thereunder and thereby denies to them constitutional due process of law. In other words, while the legislative intent behind section 11018 is, to our mind, perfectly clear, and was expressed in words entirely adequate in 1972 to convey that intent, scientific advances have since rendered these words obsolete for that purpose. In our opinion, section 11018 as now worded constitutes a potential trap for the unwary and the Legislature would be well advised to rewrite the section so that it plainly says what it means. Otherwise enforcement of the policy of the section will be imperiled.

## DISPOSITION

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 4, 1975.