[Crim. No. 16437. First Dist., Div. Four. Apr. 24, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
TRUDIE BEATRICE PALMER, Defendant and Appellant.

240

## Counsel

Matthew J. Mason, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CALDECOTT, P. J.**—Trudie Palmer appeals from a conviction of second degree murder, following a jury trial. We affirm the judgment.

Police Officer Leo Plinski was dispatched by radio to appellant's apartment. He had been dispatched in response to appellant's telephone call reporting that someone had been shot.

Appellant's husband, Michael Palmer, was lying across the left side of the bed; he appeared dead, and Officer Plinski could see a small wound in the left side of his skull behind the ear. Appellant, distraught and crying, repeatedly stated that her husband could not be dead.

Asking appellant what had happened, she replied only that her husband had been shot. When Officer Plinski asked if there were any guns in the house, appellant told him that there was a "shotgun" under the bed. Another officer on the scene reached under the bed and found an apparently new and unused .22 caliber rifle in a box. In the nightstand on appellant's side of the bed the officer also found a .22 caliber revolver partially wrapped in plastic. The revolver contained four live rounds and two empty shell casings which bore the same manufacturer's markings as the live cartridges. Although the pistol was tested for fingerprints, only unidentifiable smudges were found. Investigating officers found no evidence of forced entry into or a struggle inside the apartment.

Dr. Chan Lee, a forensic pathologist and the coroner, testified that the cause of death was a .22 caliber bullet which had entered the left-rear of Michael's head. Burned or partially burned powder particles (stippling) made a circle approximately four inches in diameter around the wound. Based upon his examination of the fatal wound, Dr. Lee was of the opinion that it could not have been self-inflicted.

Wilkaan Fong, a criminalist, test fired the pistol found at the scene, using the ammunition that had been found in it. From these tests, he

concluded that the pistol had fired the fatal shot. By experimentation, he also determined that the pistol produced a four-inch diameter stippling circle when fired twelve inches from the target. After firing these test rounds, Mr. Fong took "control" dabbings from his own hands to use in conjunction with tests to be performed on the scanning electron microscope.

Mr. Fong had been a criminalist in the Santa Clara County Laboratory of Criminalistics since 1967. Prior to that time, he had worked in the Minnesota Bureau of Criminalistics Laboratory (10 years), Pittsburgh and Allegheny Crime Laboratory (1½ years), and the Wisconsin State Crime Laboratory (3½ years). In the course of his Santa Clara County employment he routinely used such scientific instruments as spectrometers, gas chromatographs, and microscopes. But in conjunction with this case he made his first use of the scanning electron microscope. The scanning electron microscope is somewhat similar to a light microscope. What little knowledge is necessary to run the device can be acquired in a short period of time.

One of the particles found on appellant's right hand showed the presence of lead, copper, zinc, barium, calcium, and silica. These same elements were present in the ammunition found in the weapon at the scene. Hence, the elemental composition of this particle was entirely consistent with the ammunition used to fire the fatal shot. Mr. Fong could not think of anything other than a gunshot which would account for such a particle.

I

Appellant first contends that the trial court committed prejudicial error in failing to instruct *sua sponte* that evidence of a defendant's nontape-recorded admissions must be viewed with caution. (CALJIC No. 2.70.) The rule is firmly established that such an instruction, when called for by the evidence, must be given, even without a request therefor. (*People* v. *Ford* (1964) 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Bemis* (1949) 33 Cal.2d 395, 398-400 [202 P.2d 82]; see *People* v. *Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398].) An admission is "any statement by an accused relative to the offense charged." (*People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [346 P.2d 764], quoted in *People* v. *Ford, supra,* 60 Cal.2d at p. 799.)

■ The police officer testified that in response to his inquiry about possible weapons when he first arrived on the scene, appellant told him that there was a "shotgun" under the bed but failed to mention the .22 caliber pistol which he subsequently found in the nightstand. Appellant contends that the cautionary instruction on oral admissions was applicable to this evidence, since the jury could infer that appellant's failure to mention the pistol arose from a consciousness of guilt. However, the cautionary instruction applies only to *express* admissions predicated upon words, and not to an implied admission of guilt or conduct showing consciousness of guilt. (*People* v. *Atwood* (1963) 223 Cal.App.2d 316, 333 [35 Cal.Rptr. 831].) The trial court therefore did not err in failing to give CALJIC No. 2.71, regarding this testimony.

■ The only evidence relating to express oral admissions of appellant arose during the testimony of two defense psychiatrists. ■ General instructions relating to oral admissions are inapplicable to statements given in a diagnostic context to a psychiatrist. Instead, the jury should be instructed on the limited nature of the testimony. The same rule applies where the psychiatrist has been appointed or retained at the request of the defendant,[1] and where the statements are disclosed during cross-examination. "In either situation the defense can have no cause for complaint when the incriminating statements are brought to light as one of the bases of the expressed opinion, provided of course that the proper limiting instruction has been given." (*People* v. *Morse* (1969) 70 Cal.2d 711, 726 [76 Cal.Rptr. 391, 452 P.2d 607].)

■ The appropriate limiting instruction (CALJIC No. 2.10) was not given by the court. It was not requested by appellant and in the absence of a request, the court was under no duty to instruct the jury concerning the limited effect of incriminating statements disclosed by the psychiatrist's testimony. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256].)

■ Assuming arguendo that CALJIC No. 2.71 was applicable, its omission does not require reversal under the facts of this case. ■ Failure of a court to give *sua sponte* the cautionary instruction regarding oral admissions does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached. (*People* v. *Beagle*

[1]The record does not reflect whether the doctors were appointed pursuant to Penal Code section 1027, or were appointed to assist defense counsel.

(1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].) The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. (*Id.,* at p. 456.) ■■■ We find no reasonable probability that the jury would find that the statements either were not made or were not reported accurately. The remarks were made to psychiatrists called by appellant in support of her defense, and there was no conflicting evidence concerning the statements. (See *id.,* at p. 456.) Hence, it is not reasonably probable that a different result would have been reached had the instruction been given.

## II

■■■ Next, appellant complains that the court erroneously neglected to instruct *sua sponte* that the corpus delicti must be proved independently of admissions. (CALJIC No. 2.72.) ■■■ Failure to give such an instruction *sua sponte,* where appropriate, is error. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 455.) However, the omission does not constitute reversible error if, upon a reweighing of the evidence, it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of error.

■■■ In the instant case the corpus delicti—proof that death resulted from some criminal agency (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1])—was convincingly established independently of admissions. The victim, appellant's husband, was found dead of a gunshot wound to the head, and there was no evidence that he himself had fired the fatal shot. Thus, any error in the omission of the instruction cannot be deemed reversible.

## III

Appellant next contends that the trial court erred prejudicially in admitting testimony of criminalist Wilkaan Fong, based upon use of a scanning electron microscope. Fong testified that after examining minute particles obtained from the hands of the victim and appellant, he was able to identify, upon the sample obtained from appellant's right hand, particles which are characteristic of gunshot residue (hereinafter GSR). No particles were found on appellant's left hand or on either of the victim's hands. When these GSR particles found on appellant's right hand were compared with GSR particles removed from Mr. Fong's hand after he had fired the murder weapon using cartridges found in the gun, the GSR particles from both sources appeared to be identical. In making

these determinations, Mr. Fong employed a scanning electron microscope (hereinafter SEM) equipped with an X-ray analyzer. Appellant now attacks this evidence upon the grounds that: (a) the SEM is a new scientific technique which has not yet been accepted in the scientific community and, (b) Mr. Fong is not qualified as an expert using this technique.

■ The SEM provides a method of identification of particles removed from the hand by an adhesive lift technique and upon an analysis of the chemical composition of the particle through X-ray spectrometry.[2]

■ As the Supreme Court observed in *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]: "[A]dmissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert*

---

[2]The SEM operates in the following manner: "A beam of electrons is scanned over the surface of a specimen, causing secondary electrons to be emitted. The intensity of the secondary electron emission depends on the topography (hills & valleys) of the surface as well as its composition, and hence can be used to build up a point-by-point image of the surface, as the primary beam is scanned over the specimen. Because the primary electron beam can be very finely collimated, and because high-energy electrons have an equivalent wavelength much shorter than that of visible light, the electron microscope allows magnifications to be achieved that are much greater than that of the optical microscope. The usual working magnification of an optical microscope ranges up to 1000 times, with 2000 being an upper limit. Working magnifications in the scanning electron microscope are from ten to one hundred times greater, and special research instruments can do even better. Also, the SEM has an extraordinary depth of focus so that the tops of peaks and the bottoms of valleys in a surface can be seen in focus simultaneously, unlike the optical microscope which must be refocused for slight changes in elevation.

"Another feature of the SEM, which has no analogy in the optical microscope, is that the primary electron beam causes x-rays to be emitted by the specimen. The energy of these x-rays is characteristic of the chemical elements that are present in the specimen. This makes it possible to obtain a chemical analysis of the area under observation."

When viewed through the SEM, GSR "consists of discrete, micrometer-sized particles, predominantly spheroidal, and often of characteristic appearance. The x-ray analyzer will identify all chemical elements heavier than sodium contained in each individual particle, and the only elements possible for gunshot residue are those that can be derived from the constitution of the bullet, a plating or jacket over the bullet, and ingredients of the primer. The morphology of the particles allows them to be readily found among the general debris (skin, salts, minerals, and adhesive) lifted from the hand, and the chemical composition identifies them. Some particles are uniquely identifiable as gunshot residue by virtue of their compositions alone. Other compositions are less unique but, when combined with morphological information, are still typical of gunshot residue." (Aerospace Corporation, Final Report on Particle Analysis for Gunshot Residue Detection (ATR-77 (7915) pp. xvii-xviii).) (Hereinafter Aerospace Final Report.)

*to give an opinion* on the subject. (See Evid. Code, §§ 720, 801; Jones, *Danger—Voiceprints Ahead* (1973) 11 Am.Crim.L.Rev., 549, 554.) Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]"

▮ The test for determining the reliability of a new scientific technique was described in *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013, 1014 [polygraph tests] as follows: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*" (Italics added.) The *Frye* "general acceptance" rule has been adopted in California. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) Whether a particular technique has gained general acceptance in the scientific community can be ascertained by reference both to legal and scientific publications or journals and to judicial decisions. (*People* v. *Kelly, supra,* at pp. 32-36; *People* v. *Law* (1974) 40 Cal.App.3d 69, 73 [114 Cal.Rptr. 708].)

▮ There are no reported cases dealing specifically with the admissibility of SEM for GSR particle analysis.[3] Scientific journals have uniformly embraced this application, lauding it as a "major improvement" (Nesbitt et al., *Detection of Gunshot Residue by Use of the Scanning Electron Microscope* (1976) 21 J.For.Sci. 595), and a promising technique (Matricardi & Kilty, *Detection of Gunshot Residue Particles From the Hands of a Shooter* (1977) 22 J.For.Sci. 725, 737.) One study found that this technique was "always . . . successful in detecting GSR on hands immediately after shooting." (Andrasko & Maehly, *Detection of Gunshot Residues on Hands by Scanning Electron Microscopy* (1977) 22 J.For.Sci. 279, 285.) The most recent study, and the most extensive, has been that of the Aerospace Corporation (Aerospace Report No. ATR-77 (7915)-3). (Aerospace Final Report, p. 8.) That report concluded that SEM particle analysis "has been fashioned into the most definitive method of identifying and the most successful method of

---

[3]But, see *People* v. *Marx* (1975) 54 Cal.App.3d 100, 111, footnote 16 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108] (one of the scientifically and professionally established techniques used for identification of perpetrator through analysis of bite marks was a "scanning electromicroscope").

detecting gunshot residue to date. It identifies gunshot residue with greater certainty than any previous method because discrimination from a majority of occupationally caused deposits of lead, barium, or antimony is possible. It is effective for a much longer period of time after a firing than previous methods because particle analysis does not have a threshold problem." (Aerospace Final Report, p. 133.) The only criticisms of the technique at all concern whether common contaminants might be confused with GSR (see Nesbitt et al., *Detection of Gunshot Residue by Use of the Scanning Electron Microscope, supra,* 21 J.For.Sci. 595, 609), and whether adequate "handblank" (no GSR present in sample) studies had been made as a control (Matricardi & Kilty, *Detection of Gunshot Residue Particles From the Hands of a Shooter, supra,* 22 J.For.Sci. 725, 737). Both critics, rather than attacking the technique, recommended further study to resolve the questions posed. (*Ibid.*) But both queries are outdated. The first (Nesbitt) article was initially published as an Aerospace Corporation preliminary report in 1974.[4] The second (Matricardi) was published without benefit of the information contained in the Aerospace Final Report which was not released until September 1977. This final report responds to both questions: the test methodology having employed handblanks as a control check (Aerospace Final Report, pp. 6, 55)[5] and much of the final report being devoted to a study of environmental contaminants (Aerospace Final Report, pp. 55-65). Hence neither criticism remains viable. In any event, these criticisms do not attack the SEM technique, but instead raise the possibility of error, which possibility goes to the weight accorded the evidence rather than its admissibility.[6] (*People* v. *Marx, supra,* 54 Cal.App.3d 100 at p. 111; *United States* v. *Stifel* (6th Cir. 1970) 433 F.2d 431, 438; *State* v. *Dantonio* (1955) 18 N.J. 570 [115 A.2d 35, 39-40, 49 A.L.R.2d 460].)

▆▆▆ Appellant suggests that the prosecution failed to establish the reliability of the SEM for GSR particle analysis since no qualified expert

[4]The Aerospace Corporation Report No. ATR-75 (7915)-2 (Dec. 1974). The final report was specifically intended to respond to this problem. (Aerospace Final Report, p. 7.)

[5]"[C]ontrol samples taken from the hands of persons who had not fired a gun . . . never resulted in a false positive indication." (Aerospace Final Report, p. 6, accord, *id.,* p. 55.)

[6]The use of this technique differs from the use of the lie detector in that there is no question as to the accuracy of the chemical analysis. Furthermore, any expert, including defendant's expert, can study the analysis and draw his own conclusions as to whether these chemicals constitute gunshot residue particles. In a lie detector case the conclusion reached is solely the opinion of the examiner and is not subject to verification by another expert.

testified to its general acceptance in the scientific community.[7] In *People* v. *Kelly, supra,* 17 Cal.3d at page 24, it was held that the prosecution's proof purporting to establish the reliability of the voiceprint technique suffered three fatal defects: (1) it rested upon the testimony of a single witness attesting to the views of an entire scientific community regarding the reliability of the new method; (2) the witness called to establish the scientific acceptance of the new technique was a proponent of the technique; and (3) the witness was not a scientist, but a technician who was hardly competent to represent the scientific community. However, the *Kelly* rule is inapplicable in the present case. In *Kelly,* the court noted the existence of a conflict in case law, and in scientific and legal articles regarding the reliability and admissibility of the voiceprint technique. In contrast, there appears to be a unanimity of scientific opinion regarding the value and reliability of the SEM for GSR particle analysis. No useful purpose would have been served by requiring expert testimony on that point.

 Appellant argues that Mr. Fong was not qualified to interpret SEM data for GSR detection and analysis.[8] "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Generally, the trial court is given considerable latitude in determining the qualifications of an expert, and its determination will not be disturbed on appeal absent a manifest abuse of discretion. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 39.) "However, whether a person qualifies as an expert in a particular case depends upon the facts of that case and the witness' qualifications. (*People* v. *Davis* (1965) 62 Cal.2d 791, 801 . . . .) 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited.' (*People* v. *King, supra,* 266 Cal.App.2d at p. 445 [72 Cal.Rptr. 478].)" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 39.)

---

[7]Mr. Wong did not testify as to the reliability and general acceptance of GSR particle analysis by use of the SEM. Instead his testimony related to interpretation of the data from the SEM and the X-ray spectrometer.

[8]Appellant also argues that Mr. Fong is not qualified to testify as to the reliability of the SEM method of GSR particle analysis. However, this argument is irrelevant as Mr. Fong did not testify as to the reliability and general acceptance of the SEM method; instead, he testified as to the interpretation of SEM data.

 Although the present case was the first in which Mr. Fong had personally used the SEM for GSR analysis, by the time of trial, Mr. Fong had participated in six such tests. Prior to using the SEM, Mr. Fong had read a number of articles on GSR analysis through the use of the SEM and had attended a short course on the subject. He personally operated the device under the supervision of an Aerospace Corporation employee. But, as he testified, operation of the SEM does not require great expertise, and an inexperienced person can be taught the method in a relatively short period of time.

Furthermore, Mr. Fong has a degree in criminalistics plus one and a half years of graduate work in the field. He has worked as a criminalist for 15 years. He routinely uses such scientific instruments as spectrometers, gas chromatographs, and microscopes.

On the basis of the foregoing evidence, the trial court was justified in concluding that Mr. Fong was qualified to interpret SEM data for the detection and identification of GSR particles. Mr. Fong's comparative inexperience with the method simply goes to the weight of his testimony, rather than its admissibility.

## IV

 Finally appellant contends that tapes of her two-hour interview with Sgt. Demkowski were inadmissible because the interview was conducted in violation of her *Miranda* rights. She now argues that admission of the tapes into evidence was prejudicial error.

Approximately 20 minutes after the police arrived on the scene, appellant was taken to the police station and placed in the custody of Sgt. Demkowski. Without advising appellant of her constitutional rights, Sgt. Demkowski proceeded to ask routine questions[9] for the purpose of completing personal data on a police form. During this portion of the interview, appellant continually interrupted Sgt. Demkowski, denying guilt and professing ignorance of the facts. Appellant contends that this portion of the tapes should have been excluded because she had not been given the *Miranda* warnings. This argument is without merit.

---

[9]Sgt. Demkowski asked appellant for the following information: age, date of birth, telephone number, address, occupation, social security number, employment history, arrest record, husband's name, age and occupation, parents' names, address and telephone number.

■ The rule is well settled that in order to dispel the compulsion inherent in custodial police interrogation, a criminal suspect must be warned that he has a right to remain silent, that anything he says can be used against him; that he has the right to the presence of an attorney and if he cannot afford one, an attorney will be appointed by the court. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1062, 10 A.L.R.3d 974].) These warnings are absolute prerequisites to interrogation designed to elicit incriminating statements. (*Id.,* at p. 471 [16 L.Ed.2d at pp. 721-722]; see *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97].) ■ However, it is equally well established that the *Miranda* rules do not apply to routine questions relating to personal identification and background information, which questions have nothing to do with the circumstances surrounding the offense with which the declarant is charged. In such situations, there is "no process of interrogation 'designed to elicit incriminating statements.'" (*People* v. *Hernandez* (1968) 263 Cal.App.2d 242, 253 [69 Cal.Rptr. 448], quoting *People* v. *Walters* (1967) 252 Cal.App.2d 336, 338 [60 Cal.Rptr. 374].) Indeed, such routine information can be elicited from a suspect in custody even after he has exercised one or more of his *Miranda* rights. (*People* v. *Van Alstyne* (1975) 46 Cal.App.3d 900, 908 [121 Cal.Rptr. 363]; *People* v. *Johnson* (1971) 20 Cal.App.3d 168, 175 [97 Cal.Rptr. 332].) ■ Statements made spontaneously by appellant during this phase of the interview were volunteered, and were therefore admissible. (*People* v. *Johnson, supra,* 20 Cal.App.3d at p. 175.)

■ Appellant suggests that, due to her emotional instability, her waiver of her right to remain silent was ineffective. We do not agree.

■ If the People can demonstrate that a suspect knowingly and intelligently waived his privilege against self-incrimination, and his right to retained or appointed counsel, *Miranda* imposes no constitutional bar to continued questioning. (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625].) ■ "It is the duty of a reviewing court to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. [Citations.] In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be considered. [Citation.] Where the evidence is conflicting, an appellate court will accept the trial court's finding if the evidence relied on by the trial court 'is not so

improbable as to be entirely unworthy of belief.' [Citation.]" (*People* v. *Hutchings* (1973) 31 Cal.App.3d 16, 20 [106 Cal.Rptr. 905]; see *People* v. *Barrow* (1976) 60 Cal.App.3d 984, 990-991 [131 Cal.Rptr. 913].)

■ The record contains substantial evidence in support of the trial court's finding of knowing and voluntary waiver of the right to remain silent. After being advised of her rights, appellant specifically declined to invoke her right to remain silent, stating: "I'm not going to take the Fifth Amendment because I have nothing to lie about." She gave an affirmative response when asked if she understood her rights and then proceeded to discuss her case fully with Sgt. Demkowski. This conduct evidences the requisite present willingness to discuss the case fully with police. (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366], disapproved on a different point in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8 [135 Cal.Rptr. 786, 558 P.2d 872].)

We note that appellant understandably was upset, had been drinking and had a history of emotional instability. Nevertheless, she was able to respond to the questions asked of her coherently. At one point, appellant told Sgt. Demkowski, "Now you can go on questioning me." Having reviewed the record we conclude that appellant knowingly and intelligently waived her right to remain silent. (Cf. *People* v. *Barrow, supra,* 60 Cal.App.3d 984, 991; *People* v. *Fisher* (1975) 49 Cal.App.3d 174, 179 [122 Cal.Rptr. 366].)

■ Appellant contends that she subsequently invoked her right to consult with counsel. Her request to see a lawyer is a sufficient indication of a present unwillingness to discuss the case fully and completely with the police. Police questioning should have ceased immediately at that point, and it therefore was error for the trial court to admit into evidence tapes of the subsequent interrogation.

Nevertheless, we are persuaded that under the facts of the instant case, admission of the tapes was not prejudicial error, because it was merely cumulative of earlier statements. Appellant continued to deny guilt and profess her innocence, and added nothing of any substance to her earlier remarks. For these reasons we conclude that there is no reasonable probability that the jury would have reached a different result in the absence of error. (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 330-331 [46

Cal.Rptr. 515, 405 P.2d 505]; cf. *In re Morse, supra,* 70 Cal.2d 702 at p. 709.)

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1978.