[Crim. No. 24401. Aug. 8, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN G. ASTON et al., Defendants and Appellants.

482

**COUNSEL**

Arnold Breyer, Breyer, Aiello & Aiello and Mark T. Susnow for Defendants and Appellants.

John K. Van de Kamp and George Deukmejian, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Garrett Beaumont, J. Robert Jibson, William George Prahl, Thomas Greene and Patricia C. Esgro, Deputy Attorneys General, for Plaintiff and Respondent.

Ira Reiner, District Attorney (Los Angeles), Harry B. Sondheim and Patrick D. Moran, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—The primary issue in this case is whether D-cocaine, a synthetic form of cocaine, was a controlled substance under Health and Safety Code section 11055, subdivision (b)(4) at the time appellants committed their crime.

I.

During the early months of 1980, law enforcement officers from the California Department of Justice and local police and sheriff departments conducted an extensive investigation of narcotic sales in Siskiyou County. As part of that investigation, a narcotics buy program was instituted which utilized the services of a paid narcotics assistant, Phillip Smith.

As a result of the investigation, the police obtained a warrant to search the residence of appellants, John Aston and Carlita Hallett. The warrant

was executed on April 10, 1980. During the search, the police seized 6.83 grams of a white powder, packaged primarily in paper bindles in one-gram and one-half-gram quantities, and paraphernalia associated with the use of cocaine, including razor blades, straws, a handheld mirror and a small spoon.

Appellants were arrested and charged with possession of cocaine for sale in violation of Health and Safety Code section 11351.[1] They moved to set aside the information and to suppress the evidence seized during the search. (Pen. Code, §§ 995, 1538.5.) Both motions were denied and the case proceeded to trial.[2]

At trial, Bruce Palmer, a criminalist with the California Department of Justice, testified as to the contents of the white powder which had been seized. He testified that he had performed a battery of tests on the powder and it contained cocaine in salt form.

On cross-examination, Palmer was questioned about the differences between L-cocaine and D-cocaine. He explained that L-cocaine is derived from coca leaves, whereas D-cocaine is not a natural substance and must be specifically manufactured. The two forms may be distinguished by the use of a polarimeter.[3] Palmer did not have such a machine and none of the tests he performed established whether the substance seized was D- or L-cocaine. In his years as a criminalist, Palmer had never encountered D-cocaine.

Dr. Ronald Siegel, a psychopharmacologist, testified as an expert for the defense. His testimony related to the social habits and customs of cocaine users and the effects of cocaine use. Much of his testimony concerned the packaging and storing of cocaine.

Siegel had conducted a microscopic examination of the substance seized from appellants' residence, but had not performed any chemical tests on it. He testified that the substance was consistent with the appearance of cocaine. In addition, given the quantity of cocaine and the paraphernalia seized, Siegel opined that the cocaine had been possessed for personal use and not for sale.

The defense offered Dr. Siegel's testimony about the differences between L-cocaine and D-cocaine. Upon the district attorney's objection, the trial

---

[1] All statutory references are to the Health and Safety Code unless otherwise indicated.

[2] The rulings on these motions are discussed in greater detail in section III of this opinion.

[3] A polarimeter measures the angle of rotation of a plane of polarized light that results when the light is passed through certain materials. L-cocaine causes polarized light to rotate to the left, while D-cocaine causes the light to turn to the right.

court conducted a hearing outside the presence of the jury to determine its admissibility.

Siegel testified that D-cocaine is an isomer of cocaine[4] which can only be produced synthetically. L-cocaine is "pharmacologically active," while D-cocaine is not. He opined that the two are not chemically equivalent.

Siegel also stated that D-cocaine is not commonly found and is extremely difficult to manufacture. In his experience, D-cocaine is very rarely found "on the streets." Of the thousands of tests he had performed, he encountered it only once. The federal laboratories, which test cocaine for use in the federal courts, find D-cocaine in less than 1 percent of the cases.[5] However, in those cases in which Siegel retested the substance found to be D-cocaine by the federal laboratories, he found it to be L-cocaine not D-cocaine.

Although Siegel examined the substance seized in this case and "customarily" tests for D-cocaine, he could not tell whether the substance involved here was L- or D-cocaine, since he had not performed a polarimeter test on it.

The trial court rejected this proffered testimony on the ground that it suggested nothing more than "the remotest of possibilities" that the substance seized was D-cocaine.[6] The trial court also refused a defense-requested instruction which would have required the jury to find beyond a reasonable doubt that the substance seized was L-cocaine.[7]

---

[4]"Isomers are two or more compounds which have the same molecular formula but different molecular structures." (*United States* v. *Hall* (9th Cir. 1977) 552 F.2d 273, 274.) There are eight cocaine isomers: "D-cocaine, L-cocaine, D-pseudo-cocaine, L-pseudo-cocaine, D-allocaine, L-allocaine, D-alpha cocaine, and L-alpha cocaine." (*United States* v. *Bockius* (5th Cir. 1977) 564 F.2d 1193, 1195, fn. 2 & accompanying text.)

[5]Siegel also testified that state laboratories rarely perform a polarimeter test to determine whether the substance is D-cocaine.

[6]The trial court's complete comments were as follows: "It seems to me that what we had in the course of the earlier examination [of Bruce Palmer] was simply a reference to the fact that there are the two types. There is no indication that D-cocaine is extensive enough or widespread enough or is sufficiently often to be found that it is anything other in this case than the remotest of possibilities, which, of course, renders it, you know, not within the area of relevant or credible evidence that can be given to the jury. [¶] The testing that was done . . . from the evidence has indicated the routine lab testing, at least under the State of California, perhaps not under the Federal laboratories or laboratories for Federal Court uses. But nonetheless it employed the kinds of testing that is routinely used in the State and the conclusion was reached that the substance was cocaine in the general or perhaps generic sense that that term is used and as tested for purposes of these trials."

[7]The instruction read: "In the event that you find one of the defendants, or both of them, in possession of cocaine for personal use or for sale, you must find that the cocaine is a psycho-active substance and that the substance is a usable amount. You must further find that the cocaine is L-cocaine. This finding must be beyond a reasonable doubt."

Appellants were subsequently found guilty of possession of cocaine for sale and were placed on felony probation for three years. Both appeal.

## II.

Appellants contend that the trial court erred in failing to permit Dr. Siegel to testify about the differences between D-cocaine and L-cocaine and in refusing to give the related instruction on L-cocaine. The crux of appellants' argument is that the state failed to prove beyond a reasonable doubt an essential element of the crime charged, i.e., that appellants were in possession of a controlled substance under the Health and Safety Code.

Appellants' contention rests upon whether D-cocaine was a controlled substance at the time of the crime. If it was, appellants' argument would fail because it would be irrelevant whether the cocaine seized was of the D- or L-type. The argument would also fail because nothing in the record indicated that the substance seized was in fact D-cocaine.

This court has emphasized time and time again that the fundamental rule of statutory interpretation is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *T.M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) In determining the intent, the court "turns first to the words themselves for the answer." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1].)

The words must be read in context, "'keeping in mind the nature and obvious purpose of the statute where they appear.'" (*Moyer, supra,* 10 Cal.3d at p. 230.) In ascertaining the legislative intent, courts should consider not only the words used, but "the object in view, the evils to be remedied, the legislative history [and] public policy . . . ." (*Pennisi* v. *Department of Fish & Game* (1979) 97 Cal.App.3d 268, 273 [158 Cal.Rptr. 683], italics omitted.) With these familiar principles in mind, this court turns first to the words of the statute.

At the time of appellants' offense, section 11055, subdivision (b)(4) (hereafter subdivision (b)(4)) provided that "[a]ny of the following substances, . . . *whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis,* or by combination of extraction and chemical synthesis [are controlled substances]: [¶] (4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or prep-

aration thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." (Stats. 1978, ch. 699, § 1, pp. 2208-2209, repealed by Stats. 1984, ch. 1635, § 45, italics added.) As is evident from the italicized language, this statute embraced synthetic forms of cocaine.[8]

This conclusion finds support in a recent appellate decision from one of our sister states. In *Com.* v. *Slyman* (Pa.Super. 1984) 483 A.2d 519, 524-525, the court, construing a statute identical to the one at issue here, held that D-cocaine was a controlled substance, since the controlled substances statute included both natural and synthetic forms of cocaine. Focusing on the language identical to that italicized above, the court found that "the terms of [the statute] make clear that the statute's prohibitory sweep is sufficiently wide so as to embrace those varieties of cocaine which are susceptible of synthetic derivation." (*Id.*, at p. 524.)

Both the general purpose of the narcotics statutes and public policy considerations support the conclusion that D-cocaine was a controlled substance at the time of appellants' offense. ■ The Uniform Controlled Substances Act (§ 11000 et seq.) unequivocally manifests a legislative intent to restrict the transportation, sale and possession of controlled substances so as to protect the health and safety of all persons within this state. (See, e.g., §§ 11350, 11351, 11352; see also *People* v. *Clark* (1966) 241 Cal.App.2d 775, 780 [51 Cal.Rptr. 7]; *People* v. *Medina* (1972) 27 Cal.App.3d 473, 477-478 [103 Cal.Rptr. 721].) In addition, the courts have recognized that "California, of course, has a weighty public interest in the suppression of traffic in and the abuse of controlled substances, by which term narcotics and dangerous drugs have come to be known." (*Sallas* v. *Municipal Court* (1978) 86 Cal.App.3d 737, 741 [150 Cal.Rptr. 543]; see also *In re De La O* (1963) 59 Cal.2d 128, 135 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705], cert. den., 374 U.S. 856 [10 L.Ed.2d 1076, 83 S.Ct. 1927].)

Further, "the evils to be remedied" (*Pennisi* v. *Department of Fish & Game, supra,* 97 Cal.App.3d at p. 273) with regard to cocaine are manifest, regardless of whether the cocaine is synthetic or natural. Such "evils" include the control of cocaine distribution by organized crime, the negative impact that its untaxed and sale trade causes to the monetary and taxation systems of this state, and the burden placed on law enforcement officers in enforcing the cocaine statutes. ■ ■ ■ ■ (See generally, Pianin, *Criminal Forfeiture: Attacking the Economic Dimension of Organized Nar-*

---

[8]Appellants fail to address the significance of this language.

*cotics Trafficking* (1982) 32 Am.U. L.Rev. 227.)[9] In light of this general intent and overriding public policy, it would be anomalous to conclude that the Legislature intended to permit the use and sale of a synthetic form of cocaine.

Appellants ignore these considerations and focus instead on language which was added to subdivision (b)(4) *after* the date of their offense. In September of 1980, the statute was amended to add the word "isomer" to the description of the substance in paragraph (4) of subdivision (b).[10] Predictably, appellants assert that isomers of cocaine, such as D-cocaine, were not controlled substances under the version of the statute in effect at the time of their crime.

This argument is analogous to attacks on the marijuana laws which the courts have unanimously rejected. (See *People* v. *Van Alstyne* (1975) 46 Cal.App.3d 900 [121 Cal.Rptr. 363], cert. den. (1976) 423 U.S. 1060 [46 L.Ed.2d 652, 96 S.Ct. 798]; see also *People* v. *Spurlock* (1980) 112 Cal.App.3d 323, 326 [169 Cal.Rptr. 320]; *People* v. *Hamilton* (1980) 105 Cal.App.3d 113, 116-117 [164 Cal.Rptr. 153]; *People* v. *St. Amour* (1980) 104 Cal.App.3d 886, 894-895 [163 Cal.Rptr. 187].)

*Van Alstyne, supra,* is illustrative. There, the Court of Appeal considered whether a species of marijuana other than "Cannabis sativa L.," the only species described in the marijuana statute (§ 11018), was nevertheless encompassed within the meaning of that statute. The court held that "the term 'Cannabis sativa L.' in section 11018 must be construed as a general term which includes all plants popularly known as marijuana . . . ." (46 Cal.App.3d at p. 917.) The court recognized "that the Legislature intended to proscribe possession of and dealings in *all* species of marijuana and that section 11018 must be read to effectuate this underlying legislative pur-

---

[9]Appellants contend that the Legislature did not intend to regulate substances which have no stimulant effect on the central nervous system. Since D-cocaine has little or no psychoactive effect, appellants assert that the Legislature did not intend to prohibit its possession and use. This argument is not persuasive.

" ' "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." ' " (*People* v. *Drake* (1977) 19 Cal.3d 749, 755 [139 Cal.Rptr. 720, 566 P.2d 622].) Where the Legislature has required a controlled substance to have an effect on the central nervous system, it has so specified. (See, e.g., § 11055, subds. (d), (e); § 11054, subd. (e); § 11056, subds. (b), (c); § 11057, subd. (f).) Since there is no such requirement for the substances controlled in subdivision (b)(4), this court will not read one in.

[10]As amended, subdivision (b)(4) provided in pertinent part: "Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, *isomer,* derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." (Stats. 1980, ch. 1223, § 1, p. 4142, italics added.)

pose." (*Ibid.*, italics added.) The court in *Van Alstyne* rejected the technical distinction urged.

Similarly, while written in technical terms, the version of subdivision (b)(4) in effect before the 1980 amendment should be construed as making all forms of cocaine controlled substances. The technical distinction between D- and L-cocaine which appellants urge should be rejected in light of the general legislative intent and overriding public policy considerations evidenced throughout the Uniform Controlled Substances Act. (See *ante,* at p. 490.) ■ Any other conclusion would "contravene the settled rule of statutory construction that 'Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity." [Citation.]" (*People v. Clark, supra,* 241 Cal.App.2d at p. 780.)

■ In addition, a close examination of the history of the 1980 amendment reveals a legislative intent simply to conform the definition of cocaine in section 11055 to that in section 11019[11] and thereby correct an apparent drafting oversight.

The Legislative Counsel's Digest comment to the amendment states: "Under present law, isomers of any salt, compound, derivative, or preparation of coca leaves are not expressly scheduled as a controlled substance under the California Uniform Controlled Substances Act, although the definition of 'narcotic drug' in such act expressly includes such isomers that are chemically equivalent or identical to any such salt, compound, derivative, or preparation. [¶] This bill would include in Schedule II of such act the above-described isomers, so as to conform to the definition of 'narcotic drug.'" (Leg. Counsel's Dig. of Assem. Bill No. 2378 (1979-1980 Reg. Sess.).)

Further, two committee reports analyzing the proposed amendment indicated that the exclusion of the word "isomer" from subdivision (b)(4) was merely a drafting error and oversight. (Sen. Com. on Judiciary, Bill Anal-

---

[11]Section 11019 provides in pertinent part: "'Narcotic drug' means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis: . . . [¶] (d) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine."

ysis, Assem. Bill No. 2378 (1979-1980 Reg. Sess.); Assem. Com. on Crim. Justice, Bill Analysis, Assem. Bill No. 2957 (Apr. 7, 1980).)[12]

In light of this history, it is clear that the Legislature intended isomers of cocaine to be included in the Uniform Controlled Substances Act at the time of appellants' offense. Appellants' hypertechnical reading of the cocaine statute, following the fate of similar attacks on the marijuana laws, is rejected.[13]

Appellants' final argument concerns a recent amendment to the Uniform Controlled Substances Act. Effective April 2, 1985, the act was amended to make clear that D-cocaine is a controlled substance.[14] Appellants assert

---

[12]The Senate Committee on the Judiciary Bill Analysis stated: "This bill would expand the definition of cocaine to include 'any isomer which is chemical[ly] equivalent or identical.' [¶] This provision of the bill is identical to AB 2957 (Naylor) which is sponsored by the California District Attorney's Association and is also before this Committee. [¶] The CDAA asserts that the exclusion of the word 'isomers' from the existing provision defining cocaine was a drafting error and an oversight." (Sen. Com. on Judiciary, Bill Analysis, Assem. Bill No. 2378 (1979-1980 Reg. Sess.).)

The Assembly Committee on Criminal Justice Bill Analysis stated: "The Uniform Controlled Substances Act governing the regulation and prohibition of dangerous drugs and narcotics was adopted in California in 1972. In defining controlled substances, the Act generally has included 'isomers' as substances covered under its provisions. Also, in another definitional section (H. & S. Sec. 11019), cocaine is defined to include isomers. According to the proponents, the exclusion of the word 'isomer' from the provision defining cocaine for criminal purposes was a drafting error and oversight." (Assem. Com. on Crim. Justice, Bill Analysis, Assem. Bill No. 2957 (Apr. 7, 1980).)

[13]Appellants urge this court to follow the lead of several federal cases which have, invoking the "cocaine isomer theory," concluded that the jury should determine whether the substance in question falls within the statutory prohibition. (See, e.g., *United States* v. *Francesco* (1st Cir. 1984) 725 F.2d 817, 821; *United States* v. *Scott* (4th Cir. 1984) 725 F.2d 43, 45; *United States* v. *Bockius, supra,* 564 F.2d at p. 1194.)

This court declines that invitation. Although the definition of cocaine in the federal statute at issue in these cases contained language almost identical to that in subdivision (b)(4), the federal statute additionally required that the substance have a high potential for abuse. (21 U.S.C. § 812(b)(2)(A).) The California statute contained no such requirement.

Moreover, the federal cases permit a cocaine conviction even in the absence of evidence that the substance seized has been tested to determine that it is not D-cocaine. (*United States* v. *Arias* (5th Cir. 1981) 639 F.2d 1183, 1185; *United States* v. *Hall, supra,* 552 F.2d at pp. 275-276.) Even under federal authority, since there was only the "remotest of possibilities" that D-cocaine was involved here, appellants' convictions would be affirmed.

Finally, it is noteworthy that the federal statute was recently amended to include "cocaine and ecgonine and their salts, *isomers,* derivatives, and salts of isomers and derivatives . . . ." (21 U.S.C. § 812(c) Schedule II (a)(4), italics added.) This amendment was similar to the 1980 amendment to subdivision (b)(4), suggesting that D-cocaine has in fact been controlled under federal law.

[14]As the legislative committee analyses to the bill which enacted the 1985 amendment noted, the amendment would "revise the laws to include a broadened range of cocaine [and] would encompass and therefore prohibit d-cocaine . . . ." (Assem. Com. on Public Safety, Bill Analysis, Sen. Bill No. 252; Sen. Floor Analysis, Sen. Bill No. 252 (Feb. 26, 1985).) Among other revisions, the amendment added "[c]ocaine, whether natural or synthetic, or any salt, isomer, derivative, or preparation thereof" to the list of controlled substances in section 11055. (§ 11055, subd. (b)(6).)

that the amendment demonstrates that subdivision (b)(4) was, at best, ambiguous as to its coverage of D-cocaine at the time of the offense.

Specifically, appellants point to the urgency clause of the law. In relevant part it provides: "This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety . . . . This is an emergency situation in which court cases may be dismissed unless ambiguities regarding forms of cocaine are resolved by statute." Relying upon the familiar rule of statutory construction that an ambiguous penal statute must be construed in a manner more favorable to the offender (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 145-146 [197 Cal.Rptr. 79, 672 P.2d 862]), appellants argue that this court must construe the version of subdivision (b)(4) in effect at the time of the offense to exclude D-cocaine.

The amendment was a direct response to the Court of Appeal decision in this case, which had concluded that D-cocaine was not a controlled substance. (Assem. Com. on Public Safety, Bill Analysis, Sen. Bill No. 252; Sen. Floor Analysis, Sen. Bill No. 252 (Feb. 26, 1985).) That conclusion was in error. Like the 1980 amendment, the Legislature's recent action simply makes it clear that D-cocaine is a controlled substance and was so at the time of appellants' offense. (See *People* v. *Cuevas* (1980) 111 Cal.App.3d 189, 199 [168 Cal.Rptr. 519].)

In view of the foregoing, appellants' attacks on the cocaine statute are rejected. Since D-cocaine was a controlled substance at the time of appellants' offense, the trial court did not err in failing to permit the defense expert to testify about the differences between D- and L-cocaine and in refusing to give the L-cocaine jury instruction.

### III.

Appellants present several other contentions. None of them requires reversal of the convictions.

■ First, it is asserted that the trial court erred in failing to set aside the information. Specifically, it is argued that a substantial right was denied at the preliminary examination when the court failed to grant a motion to disclose the address of the paid narcotics assistant, Phillip Smith. Appellants had sought Smith's address so that he could be subpoenaed for the preliminary hearing.

■ Irregularities at the preliminary examination entitle an accused to reversal on appeal only if he "can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary

examination." (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [168 Cal.Rptr. 851, 612 P.2d 941].) ▮▮ Appellants have failed to satisfy the prejudice requirement.

Any impropriety in the preliminary examination was subsequently cured when the trial court ordered that Smith be made available to appellants before the hearing on the motion to suppress. Smith was made available and, in fact, testified as a defense witness at that hearing. Smith was also available to testify at trial, but he was not called by either side. Appellants have failed to show that they were denied a fair trial or otherwise suffered any prejudice from the magistrate's earlier failure to order the plaintiff to disclose Smith's address.

Appellants present several other arguments regarding the sufficiency of the affidavit which was submitted in support of the search warrant. A review of the relevant portions of the affidavit is helpful to place these claims in context.

According to the affidavit, Smith, the paid narcotics assistant, informed Officer Palmer that "he could purchase cocaine from subject Linda Cowell." On April 4, 1980, Palmer set up a controlled transaction. He searched Smith and his car to ensure that he possessed no narcotics before the purchase, gave him $65, placed a monitor on him and followed him to Cowell's residence. While at Cowell's house, Smith heard Cowell make a telephone call, asking someone "if she could come out and get ½ gram." Smith then gave Cowell $60 and Cowell left in her car. Officers followed Cowell but subsequently lost her.

Cowell returned one-half hour later. Via his receiver, Officer Palmer heard Cowell complaining about the price of the cocaine. Smith responded that he had "to leave and drop it off." Smith then met Palmer and gave him the bindle of cocaine which he had purchased.

The next day, Palmer set up another narcotics purchase, and the same procedures were followed. Officer Baldi monitored Smith's conversation with Cowell and heard Cowell agree to sell $65 worth of cocaine to Smith. Cowell then left her house.

The police followed her onto Wagon Trail Road. The two officers noticed Cowell's car parked in the driveway of a house. In addition, the chief of police maintained air surveillance of the house and surrounding area. He observed Cowell's car enter the driveway. He did not see anyone or any vehicle leave the area until Cowell's car left, followed by the two officers. Cowell returned to her residence, and Smith left soon after her return.

■ Appellants contend that the affidavit did not meet the requirements set forth in *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], i.e., that it failed to inform the magistrate of any underlying circumstances from which (1) the informant could conclude that narcotics were where he claimed they were, and (2) the officer could conclude that the informant was "credible" or his information "reliable." (*Id.,* at p. 114 [12 L.Ed.2d at p. 729].)[15]

The affidavit was specific enough to establish the probable cause necessary to find that cocaine was in appellants' house. Each time Smith went to Cowell's house to purchase cocaine, Cowell left the house for about half an hour. During Smith's first purchase, Cowell made a telephone call and asked if she "could come out and get ½ gram." She then left and a short time later returned with the cocaine. During Smith's second visit, Cowell again left the house. This time, the police followed Cowell to appellants' residence. From these facts, it could reasonably be inferred that Cowell obtained the cocaine from appellants and that cocaine would be found at their house. Thus, the first prong of *Aguilar* was satisfied.

In addition, Smith's information was reliable, satisfying *Aguilar*'s second prong. Smith's information was corroborated by the police. They observed Cowell leave her house while Smith was still inside. She returned a short time later. Smith's conversation with Cowell, overheard by the police, further corroborated Smith's information.

The affidavit contained ample evidence of Smith's credibility. Smith had made over 100 purchases of various controlled substances under law enforcement supervision in several California counties. The chief of police indicated that the police officers involved agreed that Smith "has proven a reliable and trustworthy assistant." Clearly, the affidavit satisfied the requirements of *Aguilar*.

■ Appellants also contend that since the affidavit contained misstatements and omitted material facts, the trial court erred in failing to suppress the evidence seized under the warrant.

■ The law as to misstatements was set forth by this court in *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234].

---

[15]*Aguilar* was overruled in *Illinois* v. *Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103 S.Ct. 2317]. However, a two-part test, essentially identical to *Aguilar*'s, applies under the California Constitution. (*People* v. *Campa* (1984) 36 Cal.3d 870, 876, 879-880 [206 Cal.Rptr. 114, 686 P.2d 634].) Since the present offense occurred prior to the effective date of Proposition 8 (initiative measure, June 1982 Primary Election), this court need not decide whether *Gates* applies to this case.

"[A] defendant may challenge the factual veracity of an affidavit in support of a warrant and if statements contained therein are demonstrated to be false and if the affiant was unreasonable in believing the truth of such information, those facts must be excised from the affidavit and probable cause tested from the remaining truthful information." (*Id.,* at pp. 100-101.)

■ The allegedly false statement in the affidavit reads: "[The] Chief of Police . . . indicated that Smith has used marijuana, but no other controlled substances, during the time of the current narcotics buy program of Siskiyou County . . . ." Appellants argue that at the hearing on the motion to suppress, Smith testified that during the buy program he had used heroin and advised either the chief of police or Officer Palmer of that fact. This testimony, appellants assert, directly contradicts the statement in the affidavit.

It is unclear from the hearing testimony whether Smith actually used heroin *during* the buy program. He testified that he could not remember when the heroin incident actually occurred and that he had used heroin once sometime when he was working in Siskiyou County. The record does not disclose how long Smith worked there or when he informed the police of his heroin use. At the hearing, both the chief of police and Officer Palmer denied that Smith told them that he had used heroin during the buy program. Taken as a whole, the testimony fails to demonstrate that the statement in the affidavit was false.

Even assuming the statement were false, the chief of police's and Officer Palmer's testimony supports the conclusion that the affiant acted reasonably in believing the facts to be true. Even appellants note that the statement may have been reasonable. Thus, appellants' challenge based on the statement fails.

■ Appellants also contend that the evidence must be suppressed because material facts, established at the hearing, were omitted from the affidavit. Specifically, appellants refer to the testimony of the chief of police. He stated that from the airplane (1) he observed a second building some 175 feet behind the house where Cowell parked her car, and (2) he never observed Cowell enter any particular building or get out of her car.

■ In *People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213], this court articulated the standards which apply when a search warrant is attacked on the ground that it is incomplete. First, the reviewing court must determine whether any of the asserted omissions are material. (*Id.,* at p. 387.) Omissions are "material" if the affidavit was rendered substantially misleading, i.e., if there was "a substantial possibil-

ity [the omitted facts] would have altered a reasonable magistrate's probable cause determination." (*Id.*, at p. 385.) If the asserted omissions are deemed immaterial and the affidavit on its face supports probable cause, the warrant usually stands. (*Id.*, at p. 387.)

If a material fact is reasonably omitted, no sanction is imposed. (*Kurland, supra,* 28 Cal.3d at p. 388.) If a material fact is negligently omitted, the reviewing court should view the affidavit as if it had included that fact and retest it for probable cause. (*Ibid.*) Lastly, if a fact is recklessly omitted or omitted with an intent to mislead, the warrant should be quashed, regardless of whether the omission is ultimately deemed material. (*Id.*, at p. 390.)

■■■■ This court must first determine whether any of the alleged omissions were material, i.e., whether there was "a substantial possibility they would have altered a reasonable magistrate's probable cause determination." (*Kurland, supra,* 28 Cal.3d at p. 385.) The chief of police's report was included in the affidavit. In it, he stated that he observed Cowell's car enter a driveway on Wagon Trail Road, he maintained air surveillance of the car, and he had a view of the house and the surrounding area. He noted that no vehicle or person left the area until Cowell's car finally backed out of the driveway.

The chief's observations were reduced to writing in his report. The argument that he failed to note certain activity which he did not see is nonsense. In addition, the chief's statement that he did not see any person leave the area renders the testimony as to the other building immaterial.

Since the omissions are immaterial and the affidavit on its face supports probable cause (see *ante,* at p. 496), the trial court's refusal to suppress the evidence was proper.

Even assuming that the omissions were material, they were, at best, negligent.[16] In such situations, the reviewing court deems the omitted material to have been included in the affidavit and retests it for probable cause. Following that procedure, the affidavit clearly supplies sufficient probable cause.

■■■■ Lastly, appellants contend that the magistrate's review of the affidavit in support of the search warrant did not satisfy the requirements of *Kaylor* v. *Superior Court* (1980) 108 Cal.App.3d 451 [166 Cal.Rptr. 598].

---

[16]Although appellants assert that the omissions were intentional, their summary allegation in that regard fails to sustain their burden of demonstrating that such omissions were reckless or made with an intent to mislead. (See *Kurland, supra,* 28 Cal.3d at p. 390.)

In *Kaylor,* the supporting affidavit incorporated by reference over 155 pages of material. Many pages were illegible. The magistrate who issued the search warrant testified that he had not read all of the police reports which were part of the affidavit. He was also unable to recall which material he had read. (*Id.,* at pp. 454-455.) Under these circumstances, the Court of Appeal held that the search warrant failed and the evidence seized had to be suppressed. (*Id.,* at p. 453.) The court emphasized that a magistrate must "examine the entire affidavit [and] determine in advance of the search whether probable cause exists; thus all the writings offered in support must be read." (*Id.,* at p. 457.)

In the present case, the appellants requested that the magistrate submit a written declaration prior to the court's ruling on the motion to suppress. He did so and stated that he was informed that the district attorney would be seeking the issuance of several search warrants in related cases. The magistrate was presented with an affidavit and proposed warrant which contained material common to "most if not all of the affidavits" to be submitted to him and which he "read in full."

The next day, several other affidavits were presented to him. When he was informed which parts differed from those previously read, he reviewed the new material but did not read the redundant portions. Further, he declared that "[a]t the time of issuance of each warrant the supporting information in the affidavit for the warrant had been considered by me and the warrant issued upon that consideration." Under these facts, it is clear that the magistrate's review of the affidavit satisfied *Kaylor.*

## IV.

At the time of appellants' offense, D-cocaine was a controlled substance under section 11055, subdivision (b)(4). Therefore, the trial court did not err in excluding expert testimony on the differences between D- and L-cocaine and in refusing to give an instruction on L-cocaine. Appellants' next contention also fails because they have not demonstrated that they were prejudiced by the failure to obtain the informant's address at the time of the preliminary examination. Therefore, the trial court's failure to set aside the information, even if it were in error, does not compel reversal. Finally, the trial court's refusal to suppress the evidence was proper.

Accordingly, the judgments of conviction are affirmed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.