STATE

v.

**Robert J. DeMAGISTRIS.**

No. 96–286–C.A.

Supreme Court of Rhode Island.

June 11, 1998.

568

Lauren Sandler Zurier, Aaron L. Weisman, Providence, for Plaintiff.

John A. MacFayden, Lise J. Gescheidt, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

The defendant, Robert J. DeMagistris, appeals from a host of criminal convictions stemming from his misadventures posing as "Josh," a videographer and photographer of nude models. Although we affirm the defendant's convictions for possession of marijuana and for multiple counts of placing obscene and harassing telephone calls to various

women, we reverse his convictions under the other two criminal statutes that are the subject of this appeal.

## Facts and Travel

Between the early summer of 1992 and June of 1993, various and sundry females received telephone calls from an individual, later revealed to be defendant, who identified himself to them as "Josh" (hereafter Josh). During these calls, Josh initiated his sales pitch gingerly, asking first whether the unwitting recipient of his call was interested in earning extra money by doing some "modeling." If the recipient remained on the line, defendant's telephone solicitations would turn progressively more salacious. Eventually he would reveal that as part of her modeling assignment, his prospect would be expected to pose nude, to assume erotic positions, and to commit various sexual acts with the inquiring photo/videographer including fellatio and intercourse. In each call defendant attempted to allay any concerns that his prospective "models" might have about being recognized locally by promising that any photographs or films he would take of them would be distributed overseas or outside of New England.

When not moonlighting as Josh, defendant held down a respectable day job as the director of special education at the Pawtucket School Department. The defendant furthered his lurid escapades by searching confidential school records to locate likely targets for his lubricious telemarketing campaign. He identified families of special education students, concentrating on single mothers or younger female students themselves. He did so thinking they might be potentially receptive candidates for his solicitations because of what he perceived to be their financial straits. Many of the phone numbers he culled from school records were unlisted in public telephone directories.

With most of his phone-call pitches Josh struck out: the targeted women either hung up, changed their phone numbers, or threatened to notify the authorities. Although one displeased recipient was unable to connect Josh with defendant during the trial of this case, the woman managed to record Josh on tape by feigning a response to another waiting call. One woman he reached, however, agreed to pose nude for Josh's camera and in fact did so, though she balked at his more prurient offers of employment. But in another call Josh hit pay dirt when he secured a second prospective model to commit an act of fellatio upon him while he filmed the event. As it turned out, this ambitious and willing "actress" was a working prostitute to whom Josh paid $40 for each "love" scene.

Josh's exploits as a nude photographer manqué and triple-X thespian eventually came to a sorry end after he dialed the unlisted number of one Susan Gity (Gity), a thirty-two-year-old parent of two boys in the Pawtucket special education program. Adhering to his trusty modus operandi, Josh eased into his spiel by asking Gity if she would be interested in modeling bathing attire or lingerie at $250 per photo session. Gity expressed interest and accepted Josh's invitation to meet with her and another female friend at her house later that afternoon. Josh arrived as scheduled and proceeded to explain that the modeling he sought would require the women to pose nude and to perform various sex acts on film, including masturbation, fellatio, and sexual intercourse. Josh told the women that he could provide marijuana for them to relax if they wanted to "get high," and he assured them that the films he would make would be distributed abroad. Josh also asked if the women knew any teenage females who would be willing to pose for him.

After Josh enlightened them about the parameters of this modeling job as he conceived it, both Gity and her friend thought better of getting involved in such activity. But to be relieved of Josh, they feigned continued interest in the project and stated that they wanted to think it over. After defendant departed, Gity telephoned the Pawtucket police. Working together, Gity and the police decided to set up a sting operation. When, as expected, defendant again called Gity the next day to ask if she had mulled over his modeling proposition, Gity asked him to come back to her house. Meanwhile, police officers set up recording devices, secreted themselves in the house, and waited in the

wings for defendant to swing into action. When defendant arrived, he and Gity conversed for several minutes. During the course of this taped conversation Gity asked Josh if he had any drugs and Josh replied that he did not. The defendant then asked Gity to disrobe while he prepared his photographic equipment. When he returned from his car carrying his camera bag, the police officers sprung the trap and arrested him.

On the basis of Gity's statement and the above-described taped conversation, police then sought a warrant to search defendant's home, his car, his camera case, and his office at the Pawtucket school system for evidence of his sexual enterprise and any drugs in his possession. With regard to the marijuana charge, the affidavit attached to the warrant application merely described Gity's recount of Josh's pitch during which he allegedly "stated that he could supply drugs if [Gity and friend] wanted it to put them at ease and make them more comfortable." The police officer affiant, however, failed to inform the magistrate about the recording made by police at Gity's apartment in which Josh sidestepped Gity's request for drugs, stating, "I don't have any," and in response to her further entreaties responded, "I don't buy the stuff that's why, so I don't have it." As a result of the warrant application and affidavit, police secured a search warrant for each location, authorizing seizure of

> "[a] certain quantity of Videos or films of an illicit nature, a certain quantity of photography and video equipment as well as any records and or documents concerning illegal, objectionable material used in the making, showing, producing of pornography, pedophilia, beastiality, and any lewd and lascivious acts. *A certain quantity of controlled or illegal substances.*" (Emphasis added.)

Upon searching defendant's residence, police did locate a small quantity of marijuana in a closed jewelry box. Police also seized scores of video tapes, one of which had captured the incident of fellatio described above, and a variety of documents containing the phone numbers of various women who had received phone calls from Josh.

The defendant was charged by information with forty-one criminal counts falling into four general groupings. The first set of counts alleged criminal solicitation of the crime against nature in violation of G.L.1956 § 11–1–9 and one count of a completed infraction of the crime against nature proscribed in G.L.1956 § 11–10–1. The second group charged the securing of an indecent act for pecuniary gain in violation of G.L.1956 § 11–34–5. The third category alleged enticement of prostitution or other indecent act as proscribed by § 11–34–8. The fourth group involved obscene or harassing telephone calls covered by G.L.1956 § 11–35–17. The defendant was also charged with one count of possession of a controlled substance in violation of G.L.1956 § 21–28–4.01(C)(1)(b).

Before trial, a Superior Court motion justice dismissed all the counts that were based on inchoate violations of § 11–10–1 (crime against nature) and the single count of a completed violation of § 11–10–1 on the grounds that the statute violated the equal-protection clauses in the Federal and the State Constitutions. The state filed a separate appeal from that judgment, which is still pending and is not addressed here.

In the meantime-trial proceeded on all remaining counts before a Superior Court justice sitting without a jury. The court found defendant guilty on all counts, save for the appealed crime-against-nature counts, and sentenced him to three years' imprisonment to be served in monitored home confinement, with all other sentences suspended or to be served concurrently. On appeal defendant concedes the propriety of his convictions for making harassing or obscene telephone calls under § 11–35–17 but contests his convictions on all other counts of the information not already subject to appeal.

### Analysis

#### A. *Section 11–34–5*

The defendant first argues that his convictions under § 11–34–5 should be set aside because the state failed to present sufficient evidence at trial to prove beyond a reasonable doubt that he intended to derive "pecuniary gain" when he attempted to beguile his

bevy of prospective models to engage in various sexual, lewd, or indecent acts. We agree.

The law under which defendant was convicted, appearing in a chapter of the General Laws entitled "Prostitution and Lewdness," reads as follows:

> **"Transportation for indecent purposes—Harboring prostitution.**—(a) It shall be unlawful for any person, *for pecuniary gain,* to secure, direct, or transport, or offer to secure, direct, or transport another for the purpose of prostitution, or for any other lewd or indecent act; or to receive or offer or agree to receive any person into any place, structure, house, building, room, or conveyance for the purpose of committing any such acts, or knowingly permit any person to remain therein for any such purposes, or to, in any way, aid or abet or participate in any of the acts or things enumerated herein." Section 11–34–5(a). (Emphasis added.)

In our judgment the primary objective of the first clause of this section is to prohibit pandering or, as it is more colloquially termed, "pimping" as a commercial enterprise.[1] In conjunction with § 11–34–1, which essentially prohibits recruitment of persons to the world of prostitution,[2] § 11–34–5 seems primarily to target the bawd who secures customers (commonly known as "johns") for a prostitute and who profits by sharing in the fee paid by the customer.

The state contends that the statute should also be construed to cover persons like defendant who secure actors for blue movies. In such a case, so the state argues, the element of "for pecuniary gain" required by the statute is satisfied when this agent or would-be producer intends to profit by subsequently selling films, tapes, or images of the indecent acts that are captured on film—even though the defendant in such a case initially pays for, rather than profits from, the doing of the indecent act. But even if we were to accede to this interpretation of the statutory proscription, we agree with defendant that in this particular prosecution there was insufficient evidence to prove beyond a reasonable doubt that defendant actually intended to profit by selling any of the photographs, tapes, or prints of his modeling shoots.

When reviewing a factual finding of a trial justice sitting without a jury, we are, of course, loath to question the justice's evaluation of the evidence, especially on a critical issue of mental intent. Accordingly we shall only set aside a criminal conviction on sufficiency grounds if the judgment appears to be clearly erroneous. *See In re Derek,* 448 A.2d 765, 767 (R.I.1982); *see also State v. Chatell,* 121 R.I. 528, 531, 401 A.2d 436, 437–38 (1979). As indicated above, the police searched high and low and thoroughly inves-

---

1. Black's Law Dictionary 1110 (6th ed.1990) defines the noun "Pander" as "One who caters to the lust of others; a male bawd, a pimp, or procurer."

2. General Laws 1956 § 11–34–1 provides in pertinent part:

   "It shall be unlawful for any person to secure a person for a house of ill fame, or to procure for a person a place as inmate of a house of ill fame, or by any promise, threat, or by abuse of person, or by any other device or scheme, to cause, induce, persuade, or encourage a person to become a prostitute, or enter upon or lead a wanton or dissolute life, or become an inmate of a house of ill fame, or enter a place in which prostitution is encouraged or allowed, or remain therein as an inmate, or come into this state or leave this state for the purpose of prostitution. It shall be unlawful for any person to receive or give, or agree to receive or give, any money or thing of value for procuring or attempting to procure any person to become a prostitute, or enter upon or lead a wanton or dissolute life, or become an inmate of a house of ill fame, either within or without this state, or come into this state or leave this state for the purpose of prostitution. It shall be unlawful for any person by any means to keep, hold, or detain against his or her will or restrain any person in any place for the purpose of prostitution, or in a house of ill fame or other place where prostitution is practiced or allowed for any purpose, or to directly or indirectly keep, hold, detain, or restrain, or attempt to keep, hold, detain, or restrain in any house of ill fame or other place where prostitution is allowed or practiced, any person by any means for the purpose of compelling that person, directly or indirectly, to pay, liquidate, or cancel any debt, dues, or obligations incurred or said to have been incurred by that person. Every person who commits any of the above-mentioned offenses, or who assists, abets, or aids another to commit any of those offenses, shall be guilty of pandering * * *."

tigated every corner of defendant's world for any evidence that he intended to profit from the photographing and filming of the persons he had contacted by telephone. But even after following every lead that came their way to link defendant to the pornography trade, the sum total of their detective work was the following: (1) that Josh had stated as a part of his approach to prospective models that he was a professional photographer and that his work would be marketed abroad, (2) that the tape on which defendant had captured the act of fellatio had not been rewound, (3) that Josh used his standard marketing pitch on the woman who performed that act on him even though she was a prostitute and presumably, the state submits, would have agreed to perform the act in the absence of any fabrications about defendant's intent to market his work, (4) that defendant had filmed the fellatio scene in a seemingly professional style (to wit, that he had managed to hold the camera steady during his multiple sexual climaxes), (5) that the nude photographs taken of the other woman who consented to model for him were never found, and (6) that defendant's disavowal during his testimony at trial of any intent to profit from any resale of the photographs or tapes (indeed, attributing his "motivation" to his need to fulfill his sexual gratification) lacked credibility.

Although the statute does not require that pecuniary gain be the defendant's sole or even primary motive, *cf. State v. Koohy,* 105 R.I. 197, 199–201, 250 A.2d 711, 713–14 (1969) (element of commercial gain under G.L.1956 § 11–31–10, addressing distribution of pornography to minors, satisfied by direct or indirect expectation of pecuniary gain), we conclude, for the reasons that follow, that this evidence taken as a whole failed to establish beyond a reasonable doubt the requisite profit motive needed to convict defendant under this statute.

First, the failure of the police to turn up any evidence connecting defendant to a commercial venture in lewd photography or pornographic movie making supports defendant's claim that his professional modeling ploy was merely a rather flimsy ruse that he used to justify his telephonic solicitations for

sex. In the absence of any evidence suggesting any real marketing activity, the fact that defendant had preserved the videotape of the one instance in which he was actually successful in procuring a model for his own sexual gratification proves little more than that he may have wanted to archive this experience on film for his own later viewing pleasure. The lack of any copies, editing, prints, or any other indicia of commercial exploitation of that tape supports the conclusion that his purpose was noncommercial. The other bits of evidence relied upon by the prosecution, whether analyzed separately or in their totality, were simply too inconclusive to prove defendant's alleged profit motive beyond any reasonable doubt. For example, Josh's steady hand with the camera would also serve to enhance his personal viewing pleasure as well as any unsubstantiated commercial ambition to market this tape for a profit. Moreover, there was no evidence suggesting that defendant knew that this woman was in fact a prostitute. And the bare fact that some of the nude photographs that defendant took could not be located cannot serve without more to establish that defendant propositioned these women so that he could sell their images for a profit.

The state argues that because the trial justice found defendant's trial testimony (in which he denied having any intent to profit from his exploits) to be incredible, the trial justice was entitled to conclude that defendant did in fact intend to derive a pecuniary gain from his activities. In *State v. Mattatall,* 603 A.2d 1098, 1109 (R.I.1992), this Court recognized that "when a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. * * * *As long as there exists some other evidence of the defendant's guilt,* disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt." (Emphasis added.)

Here, however, the trial justice's refusal to believe defendant's denial of any profit motive constitutes the *only* competent evidence suggesting that defendant acted for pecuniary gain. Thus the "other evidence of the defendant's guilt" required as corroboration

by *Mattatall* was missing. In this case the nondenial evidence indicated that he was merely acting out a misguided fantasy for his own sexual gratification and was not as a matter of fact or interest acting as a commercial photographer. In sum we conclude that the evidence failed to establish defendant's profit motive. As a result we decline to reach defendant's other arguments directed to this statute.

### B. Section 11–34–8

■ The defendant also assigns as error his convictions under § 11–34–8 of the General Laws. Section 11–34–8, entitled "Loitering for indecent purposes," provides in pertinent part:

"(a) It shall be unlawful for any person to stand or wander in or near any public highway or street, or any public or private place, and attempt to engage passersby in conversation, or stop or attempt to stop motor vehicles, for the purpose of prostitution or other indecent act, or to patronize or induce or otherwise secure a person to commit any such act."

We conclude that the conduct undertaken by defendant in this case was not the kind of passersby solicitation for prostitution or for other indecent acts that this statute was intended to prohibit. Rather, defendant's acts were proscribed by the statute that addresses obscene or harassing use of the telephone lines, a law that incidentally provides for more stringent penalties than § 11–34–8. *Compare* § 11–34–8(a) (first transgression punishable by six months' imprisonment and/or $1,000 fine) *with* § 11–35–17(a) (punishable by one year's imprisonment and/or $500 fine).

The state submits that a technical reading of the language employed in the last portion of § 11–34–8 compels the conclusion that this statute criminalizes any patronage, inducement, or securing of indecent acts regardless of where such conduct occurs. In other words the state argues that the phrase "to patronize or induce or otherwise secure a person to commit any such act" should be construed to stand apart grammatically from the rest of the statutory language proscribing any standing, wandering, or hailing of

passersby or motor vehicles for any prostitution or other indecent acts. The state further contends that the portion of that phrase that reads "any such act" refers not to such loitering or stopping of motorists but to the act of prostitution or the commission of any indecent act. Under this construction, the state argues, defendant is guilty of enticing his prospective models to engage in indecent acts notwithstanding the fact that defendant never loitered, stood, or wandered in any place and never attempted to hail any passersby or motor vehicles for such purposes.

■ The breadth of the construction prescribed by the state makes this interpretive pill too large for us to swallow. If we were to hold that § 11–34–8 bars any enticement of indecent acts wherever and whenever conducted, we would have to take the language it relies upon out of context from the rest of the statutory language that precedes it and also ignore the title given to this statute. One of the fundamental canons of statutory construction observed by this Court is that no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage. *See State v. Ricci*, 533 A.2d 844, 848 (R.I.1987); *State v. Caprio*, 477 A.2d 67, 70 (R.I.1984). We also take into consideration the rule of lenity applicable to criminal statutes. *See State v. Anthony*, 422 A.2d 921, 925 (R.I. 1980). We are of the opinion that the opening phrases of this statute should not be rendered nugatory. Rather, we are inclined to apply the statutory-construction principle of *noscitur a sociis* to the language at issue. So construed, the phrase "to patronize or induce or otherwise secure a person to commit any such act" draws its scope from its association with the other portions of the statute that immediately precede it and is limited thereby. *See, e.g., Allstate Insurance Co. v. Russo*, 641 A.2d 1304, 1307 (R.I.1994).

We also note that § 11–34–8 is located in the midst of a chapter of the General Laws addressing prostitution. Viewed in this context, we believe that the Legislature enacted § 11–34–8 primarily to bar prostitutes from hawking their wares in public—whether this is done by strutting up and down a public street or by calling out to passersby from the

shadowed stoop of a privately owned building. The statute also applies with equal force to those johns who seek to solicit passersby or motorists for prostitution or other indecent acts. Indeed, what little legislative history exists suggests that the major revision to this section in 1980 (in which § 11–34–8 was carved out of the former version of § 11–34–5, *see* P.L.1980, ch. 370) was inspired by public outcry over a rash of overt streetwalking in the West End of the city of Providence. *See COYOTE v. Roberts*, 523 F.Supp. 352, 354–55 (D.R.I.1981). Section 11–34–8 thus focuses narrowly on certain types of prostitution-related activities that are addressed by chapter 34 of title 11 of the General Laws. *See Caprio*, 477 A.2d at 70 ("[w]here one provision is part of the overall statutory scheme, the legislative intent must be gathered from the entire statute and not from an isolated provision").

■ Because § 11–34–8 is directed at the public solicitation of prostitution, its reach simply does not extend to the prohibition of obscene telephone calls or to the securing of would-be actors for pornographic movies when such solicitation occurs either over the telephone or within the confines of private residences. If Josh had directed his recruitment efforts at public passersby or motorists, we would have a different case before us. Although other sections of the penal code proscribe defendant's challenged conduct, § 11–34–8 does not. Accordingly we reverse defendant's convictions under this statute. As a result we do not reach the other issues he has raised challenging the application of this law to his conduct.

### C. *Franks Violation*

The defendant also contends that the trial justice erred in refusing to hold a so-called *Franks* hearing to address the integrity of the warrant that led to the police seizing a small amount of marijuana from his home. In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that a police officer's deliberate or reckless inclusion of false or misleading material statements in a warrant application and affidavit would require that any evidence seized pursuant to the warrant thus obtained had to be suppressed. *Id.* at 155–56, 98 S.Ct. at 2676, 57 L.Ed.2d at 672. The Warrant Clause of the Fourth Amendment, the Court explained, precludes such misconduct by law enforcement authorities for the reason that "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Id.* at 165, 98 S.Ct. at 2681, 57 L.Ed.2d at 678.

■ Pursuant to the *Franks* doctrine, a criminal defendant is entitled to an evidentiary hearing on such a subfacial challenge to the integrity of a warrant application and resulting search warrant in the following circumstances as described by the Court:

"There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. * * * Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing." *Id.* at 171–72, 98 S.Ct. at 2684–85, 57 L.Ed.2d at 682.

Federal jurisprudence thus demands a two-part test when ruling upon a request for an evidentiary hearing on an alleged *Franks*

violation. First, the defendant must make an offer of proof that the misleading aspect of the warrant application is traceable to the affiant's intent to deceive the magistrate issuing the warrant or that the affiant proceeded with reckless disregard for the veracity of the statements included in his or her affidavit. Second, the defendant must demonstrate that the falsehood was material in that there would have been no probable cause to issue the warrant if the magistrate had been honestly informed.

Many jurisdictions, including Rhode Island, have recognized that the *Franks* doctrine extends to material omissions as well as to affirmative falsehoods.[3] However, this court has yet to address the implications of the *Franks* doctrine in depth or to define the outer contours of the constitutional protections surrounding the warrant clauses of the Federal and the Rhode Island Constitutions. *See State v. McGoff,* 517 A.2d 232, 236–37 (R.I.1986) (holding that offer of proof was deficient under *Franks* because it was "simply self-serving," and not reaching further issues); *Wilshire,* 509 A.2d at 451 (holding that omission of "rather tentative" witness observation was alone insufficient to show that affiant intentionally or recklessly excluded exculpatory material, and reaching no further issues); *State v. DeMasi,* 452 A.2d 1150, 1153 (R.I.1982) (holding that affiant "never attempted to beguile the magistrate who signed the warrant by making recklessly false statements or intentional misrepresen-

tations in his affidavit," and not reaching further issues), *cert. denied sub nom.,* 460 U.S. 1052, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983).

The defendant urges this Court to adopt the approach to *Franks* violations taken by the First Circuit in *United States v. Rumney,* 867 F.2d 714 (1st Cir.), *cert. denied,* 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989).[4] There a police officer seeking a search warrant included an affidavit which stated that a principal witness had admitted chauffeuring the accused to the scene of the crime but that the witness had claimed to have had no inkling that the defendant intended to commit a crime after he arrived there. *Id.* The police officer neglected to inform the magistrate, however, that the same witness had earlier denied any connection with the defendant and had offered yet another version of events after having been arrested as an accomplice. *Id.* With regard to the first prong of the *Franks* test, the First Circuit concluded, "[w]e will assume that the omissions must have been made either knowingly or at least recklessly, since the officer who signed the affidavit was a member of the group that obtained the information directly from [the principal witness]." *Id.* at 720. However, the *Rumney* court ultimately found that the offending omissions were immaterial because inclusion of the witness's "predictable denials" prior to his arrest would not have undercut the witness's

---

3. *See State v. Wilshire,* 509 A.2d 444, 450–51 (R.I.1986) (impliedly accepting that *Franks* extends to "sin of omission"), *cert. denied sub nom.,* 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987). *See also United States v. Atkin,* 107 F.3d 1213, 1217 (6th Cir.1997); *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.1990); *Stewart v. Donges,* 915 F.2d 572, 583 (10th Cir.1990) (extension of *Franks* to include material omissions clearly established for 42 U.S.C. § 1983 purposes); *United States v. Paradis,* 802 F.2d 553, 558 (1st Cir.1986); 2 Wayne LaFave, *Search and Seizure* § 4.4(b) and nn. (3d ed.1996); 1 William Ringell, *Searches, Seizures, Arrests & Confessions* § 7.4 (3d ed.1998).

4. The defendant has not requested that we undertake an independent assessment of the application of the federal *Franks* doctrine to omissions of critical facts from a warrant application (as opposed to the issue addressed in *Franks* that involved application of the doctrine to cases al-

leging the inclusion of affirmative mistruths in the application). Nor does defendant ask that we determine whether the Warrant Clause contained in article 1, section 6, of our State Constitution would offer greater protections or different sanctions from those available under federal law. *Cf. People v. Aston,* 39 Cal.3d 481, 216 Cal.Rptr. 771, 703 P.2d 111, 120 (1985) (omissions are material if "substantially misleading," and the affidavit will be retested if the omissions were negligent, but if intentional, the warrant will be quashed regardless of materiality), *limitation by statute recognized, In re Lance W.,* 37 Cal.3d 873, 210 Cal.Rptr. 631, 694 P.2d 744 (1985); 2 Wayne LaFave, *Search and Seizure* § 4.4(b) and nn. (3d ed.1996) (noting varying views of proper scope of warrant protections); 1 William Ringell, *Searches, Seizures, Arrests & Confessions* § 7.4 (3d ed.1998). Accordingly we have no occasion to address these issues.

credibility so as to dispel any basis for a magistrate's finding of probable cause. *Id.*

█ Applying the *Rumney* analysis to the facts of this case, we are not persuaded that a *Franks* hearing had to be convened. Even if we were to assume that the police affiant's failure to mention the no-drug exchange between Josh and Gity recorded during the sting operation was deliberate or reckless, we conclude that the omission was not material. As in *Rumney,* 867 F.2d at 720, we review a lower court's determination that the defendant failed to satisfy the *Franks* standard with deference. *See DeMasi,* 452 A.2d at 1153 (adopting clear error standard); *see also McGoff,* 517 A.2d at 237 (reviewing for abuse of discretion). *Cf. State v. Correia,* 707 A.2d 1245, 1249–50 (R.I.1998) (this Court reviews a Superior Court probable cause determination de novo, although great deference is afforded to the issuing magistrate's determination if it appears that he or she had a substantial basis for finding probable cause).

Here, we cannot say that the trial court's refusal to conduct a *Franks* hearing was an abuse of discretion. Even if one gives the defendant all benefit of doubt, his admissions regarding his association with drugs simply presented conflicting statements made to Gity at different times.[5] Gity reported to police that the defendant had in effect admitted that he could supply drugs to help her relax and actively encouraged her to accept his invitation. However, when later pressed to produce the promised anodyne, defendant seemingly denied having any association with such contraband altogether. Even though only one of these statements would seem to be true and the later one was caught on tape, a magistrate in the position of assessing a warrant application is not called upon to resolve credibility questions with any degree of finality or to come to any firm conclusions beyond making a threshold determination that there exists a "fair probability that contraband or evidence of a crime will be found

in a particular place." *State v. King,* 693 A.2d 658, 661 (R.I.1997) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). We are of the opinion that had the improperly omitted statement been included in the warrant application, ample probable cause would still have existed on the face of the application to justify its issuance, notwithstanding the defendant's apparently conflicting statements about his ability to supply drugs. *Accord Rumney,* 867 F.2d at 720 (employing insert-and-reassess approach to test materiality of omitted statements). Thus the Superior Court justice was not clearly wrong in refusing to conduct a full-fledged *Franks* hearing.

### Conclusion

For these reasons the defendant's appeal is sustained in part and denied in part, and the papers in the case are remanded to the Superior Court. While his convictions under §§ 11–34–5 and 11–34–8 are vacated, those convictions under § 11–35–17 and § 21–28–4.01(C)(1)(b) are affirmed.

GOLDBERG, J., did not participate.

---

5. Another interpretation of Josh's tape-recorded statements is that when he said, "I don't have any [stuff]" and "I don't buy the stuff that's why, so I don't have it," he only meant to indicate that he did not have any drugs available at that particular time but that he could obtain drugs for his

models (as initially promised in his phone call) by means other than purchase—potentially by rendering photography services to others he had solicited to model for him. However, as indicated above, we do not rely on this interpretation of Josh's utterances.